## EARNSHAW v. CADWALADER.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.

No. 348. Argued April 29, 1892. — Decided May 16, 1892.

Under schedule C of § 2502 of the Revised Statutes, as enacted by § 6 of the
act of March 3, 1883, c. 121, (22 Stat. 497,) iron ore was charged with a
duty of 75 cents per ton, and that duty was assessible on the number of
pounds of iron ore reported by the United States weigher, and not on the
ore after the moisture was dried out of it.

THIS is an action at law, brought in January, 1888, in the
Circuit Court of the United States for the Eastern District of
Pennsylvania, by John W. S. Earnshaw against John Cadwalader, collector of customs for the district of Philadelphia, to
recover $71.61, as an alleged excess of duties exacted by the
collector on three importations of iron ore, made in February
and April, 1887, by the plaintiff, into the port of Philadelphia,
from Porman, Spain. The case was tried before a jury, in
October, 1888, who rendered a verdict for the defendant, and
he had a judgment, to review which the plaintiff has brought
a writ of error.

The iron ore was dutiable under Schedule C of § 2502 of the
Revised Statutes, as enacted by § 6 of the act of March 3, 1883,
c. 121, (22 Stat. 497,) under the provision imposing a duty as
follows: "Iron ore, including manganiferous iron ore, also the
dross or residuum from burnt pyrites, seventy-five cents per
ton." The plaintiff seasonably paid, protested, appealed and
brought suit. The form of his protest as to each of the three
importations was the same. The collector imposed a duty of 75
cents per ton on the number of pounds of iron ore reported by
the United States weigher. The protest stated that the importer claimed that the collector erred in exacting duty on the
full weight reported by the weigher, and that the importer
paid the same under protest, "because the importation is dutiable as merchandise which is described as 'iron ore' in act of

March 3, 1883, chapter 121, sec. 6, Schedule C, and 'iron·ore' was and is understood among dealers in and consumers of such iron ore in this country to refer and did refer to iron ore in the condition of dryness in which it is sold in trade, which condition of dryness is usually ascertained in trade by subjecting the iron ·ore to a temperature of 212° Fahrenheit; but you have levied the rate of seventy-five cents per ton on my importation when mixed with, and the weight increased by, a considerable per cent of water, thereby making me pay, in violation of law, that rate of duty on water, because the iron ore of commerce, to. which the said tariff law applies, is iron ore in a dry state — *i.e.* free from water not chemically combined — and because, although the method of ascertaining the amount of such mechanically mixed moisture is well known, easily applied, and actually used between buyers and sellers of such ores in this country, you have refused to ascertain the true taxable weight of the iron ore of this entry in this or any other way, or make any allowance for such mechanically and accidentally combined moisture, in ascertaining the weight."

The plaintiff introduced evidence tending to show that samples, representative of the whole mass, were taken by three different samplers, on the arrival of the different cargoes, which samples were delivered to two chemists, in the same condition as taken, in order that the amount of moisture mechanically present, and the amount of metallic iron, might be ascertained. The plaintiff then introduced evidence tending to show that the cargoes of iron ore so imported contained water mechanically present, and not chemically combined with the ore, and claimed that such water was not subject to duty as "iron ore." Evidence was given as to the quantity of such water; and there was no dispute as to the propriety of the method of ascertaining it, which was to dry the samples at the heat of 212° Fahrenheit, and thus expel the water or moisture mechanically present, without having any effect on the chemical ingredients of the ore.

The plaintiff asked the court to rule that " the term 'iron ore,' in its ordinary meaning, does not include water which is mechanically present and not chemically combined with

the ore." The court refused so to rule, and the plaintiff excepted.

In the course of the trial, the court, against the objection of the plaintiff, admitted evidence tending to show that the iron ores of the United States, which resembled, and were like and had the same characteristics as, the imported iron ore involved in this suit, were dealt in in this country without an allowance for moisture. The court, in ruling in favor of the admission of such evidence, stated that the purpose of the testimony was to show whether it was true, as was said by some of the witnesses, that the signification of "iron ore," when applied to the description of ore in question, meant the dry ore; because, as the court said, if it were shown that, in dealing in precisely the same character of ore mined in the United States, there was no such limitation of the meaning, and no such dealing, that bore directly on the weight and credibility of the testimony given by the plaintiff for the purpose of making an exception in favor of the particular description of ore in question; that it was a legitimate argument that, if the designation or signification of the term "iron ore," when applied to such description of soft ore mined in the United States, included the water, it would be unreasonable to believe that the designation of "iron ore," when applied to precisely the same kind of iron ore, meant the dry ore, without the water, simply because it came from across the sea; and that, although it was not direct testimony as to the iron ore in question, it was testimony in respect to iron ore precisely like it. The plaintiff excepted to the admission of the evidence.

The court, among other things, charged the jury as follows: "The term 'iron ore,' as defined by lexicographers and used and understood in commerce generally, includes the water as well as other foreign substances held in combination with iron, whether the combination be chemical or physical. It follows, therefore, that the duty imposed and complained of here was properly imposed, unless a distinction is to be drawn between this ore and iron ore generally." The plaintiff excepted to that part of the charge.

The plaintiff requested the court to charge the jury as fol-

lows : "If iron ore, as imported into the United States, is generally bought and sold on the basis that the water which is only mechanically present and not chemically united with the constituents of the ore should be removed, and the usual mode to remove such moisture, to ascertain this basis and determine the true ore, is by drying at 212 degrees Fahrenheit, that course should be adopted to determine what is dutiable iron ore under the tariff." The court refused so to charge, and remarked that there was no evidence to warrant a finding that the iron ore in question "is generally bought and sold on the basis that the water which is only mechanically present should be removed," except where that basis was stipulated for by special contract; and that such transactions (founded on contract) were unimportant, standing alone, in the consideration of the case. To such ruling of the court the plaintiff excepted.

The plaintiff also requested the court to charge the jury as follows: "If upon the whole evidence you are in doubt whether the iron ore of commerce is iron ore free from water, not chemically combined with it, it is your duty to give the importer, the plaintiff in this case, the benefit of the doubt, and your verdict should be for the plaintiff." The court refused so to charge, and stated that the question must be decided according to the weight of the evidence.

In the course of the charge given, the court submitted to the jury the question as to what the term "iron ore" was understood to mean commercially, and on this subject the court said to the jury : "In the enactment of tariff statutes, Congress must be understood, when employing terms to describe articles of commerce, to employ them in the sense in which they are commercially understood and employed by persons dealing in such articles and familiar with the subject — in other words, as they are understood and employed in the commerce to which they relate. If, therefore, the plaintiff has proved that the term 'iron ore' when applied to the imported ore here in question, signifies to those dealing in it and familiar with the subject dry ore only — that is, ore from which the water has been extracted — this signification must be given to the term as applied to this ore. To warrant this construction, however,

the evidence must satisfy you that the term has this significa-
tion generally — that is, habitually, commonly — in the com-
merce respecting this ore, so as to be obligatory upon parties
dealing in the ore, without special contract on the subject.
Does the evidence satisfy you that it has? Looking at
the question in the light of the plaintiff's testimony alone (in
the first instance), is the existence of this signification, under the
circumstances stated, proved? His witnesses when first ex-
amined went little further than to say that in buying and sell-
ing and dealing generally in this ore parties act upon the
understanding that the ore is dry; in other words, that the
water is excluded from the weight. They further say, how-
ever, that special contracts are entered into respecting it gen-
erally, if not always, whereby the rights of purchasers to have
the water so excluded is secured. If the case had rested here,
as it did when the plaintiff first closed his testimony and the
defendant moved for a nonsuit, the court would, as it inti-
mated, have held that the evidence was insufficient to justify
a finding in the plaintiff's favor. The evidence seemed to show
no more than a course or custom of dealing by express con-
tract respecting the ore, which, standing alone, should have no
influence in ascertaining the signification of the term in ques-
tion as applied to it. Subsequently the plaintiff called these
witnesses back and inquired of them, ' What is the term " iron
ore " understood to mean commercially among importers and
dealers in imported ore ?' In other words, What is the iron
ore of commerce — imported ore? And the witnesses an-
swered, substantially, that it is understood to be ore without the
water; dry ore. The witnesses repeat their former testimony
respecting the custom or habit of dealing in the ore, that par-
ties proceed upon the understanding that the water is to be
excluded, and that their contracts contain a stipulation secur-
ing its exclusion. There were three or four witnesses, very in-
telligent men, called back, who thus testified respecting the
signification of the term as applied to this ore. This testimony,
in terms, at least, seemed to have a broader scope than that
previously heard, and to warrant a submission of the question
to you. In considering it, however, you must bear in mind

what these witnesses said when first examined, as well as subsequently, and inquire whether their testimony thus taken altogether shows more than a course or custom of dealing, in which parties habitually contract, by special provision, for the exclusion of water from dry ore. If it shows no more than this, it is of no value. To sustain the plaintiff's case the testimony must show, as before stated, that the term 'iron ore,' as applied to the ore in question, signifies, to persons familiar with the commerce respecting it, dry ore only; that this is the common, well known, and recognized signification of the term, when so applied, upon which signification parties buying and selling, or otherwise dealing in the ore, have a clear right to depend, without any contract or stipulation respecting it. Does the plaintiff's testimony, even when considered alone, show that the term so applied has this signification? In determining this, it is important to remember that parties dealing in the ore, according to the plaintiff's testimony, do not seem to rely alone upon the existence of this signification in dealing, but resort to contract for excluding the water. Neither you nor the court can overlook the fact that this manner of dealing by special contract seems to be inconsistent with the alleged existence of a common, well-understood signification of the term 'iron ore,' such as is here set up. I have thus called your attention to the question in the light of the plaintiff's testimony alone. It is not to be decided, however, without considering as well the testimony produced by the defendant. The government has called several witnesses — a larger number than were called by the plaintiff; and equally intelligent, apparently — who say, in substance, that they are familiar with the ore in question, several of them being dealers in it, and that the signification of the term 'iron ore' as applied to it, includes the water, as well as everything else contained in the mass, just as the term does when applied to any other description of iron ore; that there is no such commodity known to commerce as dry iron ore; that, while the soft foreign ore is sometimes bought with the water excluded, it is also bought without respect to the water, and [? as] all other iron ore is bought, and that when it is so bought, with the water excluded,

this is always specially provided by the term ' ores,' as when applied to hard and all other descriptions of ore. Now you must determine, from all the evidence in the case, whether it is proved that the term ' iron ore,' when applied to the description of imported ore here involved, has the limited signification attributed to it by the plaintiff — that is, that it signifies dry ore — ore with the water excluded. If you find it has this signification generally, commonly, when so applied, your verdict will be for the plaintiff for the amounts claimed. Otherwise, your verdict will be for the defendant." There was no other exception by the plaintiff to any part of the charge than the exception above specifically mentioned.

*Mr. William S. Hall* for plaintiff in error.

The term " iron ore," in its ordinary meaning, does not include water which is mechanically present and not chemically combined with the ore.

Evidence was introduced by the plaintiff in regard to the nature and character of this water, so mechanically present and not chemically combined, which was not contradicted, and tended to show that the amount of water, mechanically present and not chemically combined, in iron ores like those in suit is variable and accidental, and varies in ores which come from the same mine, the chemical ingredients of which remain practically constant, according as the ore has been subjected to rain, or exposure to the elements ; that the amount of the water so present varies from a few hundredths of 1 per cent up to 12, 16 and 25 per cent ; that this variation is due to the mechanical absorption of water, and varies with the season or weather to which it is subjected ; and that all such moisture would dry out of the ore if exposed long enough to the sun ; and that the ore, as it comes from the mines in dry weather, is dry as dust.

The words " iron ore " in the act of March 3, 1883, 22 Stat. c. 121, p. 488, § 6, Schedule C, p. 496, have been interpreted in *Marvel* v. *Merritt,* 116 U. S. 11, 12, where the court says : " Webster, in his dictionary, defines . . . *ore* as ' the compound of a metal and some other substance, as oxygen, sulphur

or arsenic, called its *mineralizer*, by which its properties are disguised or lost.' "

It certainly cannot be claimed that water or moisture merely mechanically present, which would dry out if exposed to the sun, in any way mineralizes the metal or causes its properties to be disguised or lost.

Worcester, in his dictionary, defines ore as " a mineral body which is reduced to the metallic state by fire; a metal *chemically combined* with some mineralizing substance which completely disguises its usually recognized and useful properties." This definition by its express terms excludes water unless chemically combined with the metal.

The water is worthless, in fact is worse than worthless, and is an injury to the metallurgical value of the ore. It is an impurity which is mixed with, but is not a part of, the ore. Take away any of the chemical constituents of the ore and you are taking away part of the ore, and the residuum will not be ore. Take away this mechanically mixed water and you have left the true ore free from an impurity.

The same act imposed a duty of 20 cents per bushel on linseed or flaxseed. An importation of that article contained clay, sand and gravel to an average of 4 per cent. It was held that the importer should be required to pay duty only after deducting, with proximate accuracy, the quantity of such impurities. *Wright & Lawther Lead Co.* v. *Seeberger*, 44 Fed. Rep. 258.

This term iron ore received a legislative interpretation in the act of October 1, 1890, 26 Stat. 574, c. 1244, Schedule C, where, after imposing a duty upon " iron ore" it was "*provided further*, that in levying and collecting the duty on iron ore no deduction shall be made from the weight of the ore on account of moisture which may be chemically or physically combined therewith."

" When one finds a proviso, the presumption is, that but for the proviso the enacting part of the section would have included the subject matter of the proviso." *Mullins* v. *Treasurer of Surrey County*, 5 Q. B. D. 170, 173. "The proviso is generally intended to restrain the enacting clause and to except something which would otherwise have been within it,

or in some measure to modify the enacting clause." _Wayman_ _v. Southard_, 10 Wheat. 1, 30. "It takes out of the body of the enactment that which otherwise would be within it." _Dollar Savings Bank_ v. _United States_, 19 Wall. 227, 236.

By this proviso Congress recognizes that the term "iron ore," in the body of the enactment does not include water mechanically or physically present, and that an allowance in ascertaining the dutiable weight on the custom house scales should be made for it, and provides that this allowance shall not hereafter be made.

Laws imposing duties are never to be construed beyond the natural import of the language. Such statutes are construed most strongly against the government. _Adams_ v. _Bancroft_, 3 Sumner, 384, 387; _United States_ v. _Wigglesworth_, 2 Story, 369, 374. "If the question were one of doubt, the doubt would be resolved in favor of the importer." Mr. Justice Blatchford in _Hartranft_ v. _Wiegmann_, 121 U. S. 609, 616.

_Mr. Assistant Attorney General Parker_ for defendant in error.

MR. JUSTICE BLATCHFORD, after stating the case, delivered the opinion of the court.

The evidence on the part of the plaintiff tended to show that the quantity of water mechanically present, and not chemically combined, in iron ores like those in question, was variable and accidental, and varied in ores which came from the same mine, the chemical ingredients of which remained practically constant, accordingly as the ore had been subjected to rain or to exposure to the elements; that the amount of water thus mechanically present would vary from a few hundredths of 1 per cent up to 12, 16 and 25 per cent; that such variation was due to the mechanical absorption of water; that practically all the moisture mechanically present would dry out in the sun; and that the ore as it came from the mines in dry weather was as dry as dust.

The question involved was, whether the duty of 75 cents

per ton should be imposed on the government weight of the article, according to the finding and record of the weighing officers, or whether such official weight should be reduced by an allowance sufficient to render the iron ore no greater in weight than its weight if raised, under conditions favorable to evaporation, to a heat of 212° Fahrenheit. The burden of making out a claim to the recovery of this difference rests upon the importer.

The history of the question in the Treasury Department is as follows :

On September 8, 1879, Assistant Secretary French, in a letter to the collector of customs at New York, refused to make an allowance for the increase of weight from moisture in certain imported iron ore, holding that the duty accrued on the total quantity landed, as shown by the weigher's return.

In a letter of May 17, 1886, by Acting Secretary Fairchild to the collector of customs at Philadelphia, the same ruling was made, and it was held that under the regulations of the Department and its decisions, no allowance could be made for the absorption of moisture or sea water on the voyage of importation, unless upon an application filed with the collector of customs within ten days after the landing of the goods, and an ascertainment and report by the appraiser of the percentage of damage or increased weight.

In September, 1886, an importer of iron ore contended that the duty of 75 cents per ton imposed by the act of March 3, 1883, upon iron ore, meant ore dry at the temperature of 212° Fahrenheit. The Treasury Department submitted the question to the Attorney General; and Acting Attorney General Jenks, in a letter to the Secretary, dated September 17, 1886, (18 Opinions, 466,) held that the duty was to be levied on whatever was the known commercial signification of " iron ore ; " and that if iron ore dried at a temperature of 212° Fahrenheit was the standard adopted in commercial transactions of iron ore, and was what was known in commerce as iron ore, it was the ore contemplated by the statute, and the duty should be levied on that basis, citing *Two Hundred Chests of Tea*,

9 Wheat. 430; *Barlow* v. *United States*, 7 Pet. 404; and *Drew* v. *Grinnell*, 115 U. S. 477.

Assistant Secretary Fairchild, on October 29, 1886, transmitted to the collector of customs at New York a copy of the ruling of Acting Attorney General Jenks, of September 17, 1886, and stated that the Department had made careful inquiry as to the custom of trade in buying and selling imported iron ore; that the great weight of evidence was to the effect that the iron ore of commerce was iron ore free from water not chemically combined; that it was the custom to expel water which was only mechanically present, before proceeding to ascertain the amount of ore which was bought and sold; that, to do this, the ore was heated to 212° Fahrenheit; that the rule "is hereby established" that, for the purpose of ascertaining the amount of duty to be paid upon importations of iron ore, the weight of the ore when heated to a temperature of 212° Fahrenheit should be first found, and upon that weight duty should be collected; and that entries of prior importations might be reliquidated and duties refunded in accordance with that rule, in cases where the importers had fully complied with the provisions of § 2931 of the Revised Statutes as to protest, appeal, and suit.

On the 5th of November, 1886, Assistant Secretary Fairchild telegraphed to the collector of customs at Baltimore to suspend until further orders all reliquidations of entries on account of allowance for moisture on importations of iron ore, under the Department's decision of October 29, 1886.

On the 12th of January, 1887, the Treasury Department submitted to the Attorney General substantially the whole question whether the term "iron ore," as used in the tariff act of March 3, 1883, meant iron ore dried at a temperature of 212° Fahrenheit, or iron ore as it was delivered at the port of entry for weighing. In reply, Attorney General Garland, in a letter to the Secretary of the Treasury, dated January 19, 1887, (18 Opinions, 530,) referred to the letter of Acting Attorney General Jenks, of September 17, 1886, and, in speaking of the rule that the iron ore of the statute was to be interpreted as the iron ore of commerce, cited the cases of *Two*

*Hundred Chests of Tea,* 9 Wheat. 430; *Barlow* v. *United States,* 7 Pet. 410; and *Elliott* v. *Swartwout,* 10 Pet. 137, 151; and said that "commerce," as used in that connection, was to be understood in its comprehensive sense of buying and selling and exchange in the general sales or traffic of our own markets; that special contracts in which the term iron ore was defined by special description or qualifying words would be no evidence of the general commercial signification of the term; that, if the departmental practice and interpretation as to the collection of customs on iron ore had been of long standing and uniform prior to 1883, it was to be presumed that, if such interpretation had been false and vicious, Congress would have guarded. against a like interpretation of the act of 1883; that, as that act had not repudiated any prior interpretation, the presumption was very strong that Congress in enacting the act of March 3, 1883, had understood the iron ore of commerce to be what the practice of the Department had established; and that, if the decision before referred to, of September 8, 1879, that the total quantity landed, as shown by the weigher's return, without allowance for increase of weight, from moisture, of the iron ore imported, was subject to duty, was in accordance with the practice of the Department prior to September 8, 1879, and was adhered to afterwards as the rule, it would be a pregnant fact to guide to the same conclusion.

On February 3, 1887, Secretary Manning, in a letter to the collector of customs at New York, stated that, since the letter of Assistant Secretary Fairchild of October 29, 1886, and the suspension announced by Assistant Secretary Fairchild to the collector of customs at Baltimore by the telegram of November 5, 1886, the Secretary had duly considered a large amount of new testimony, both for. and against the proposition laid down in such letter of October 29, 1886, that the term "iron ore," as used in the tariff act of March 3, 1883, meant iron ore when dried at a temperature of 212° Fahrenheit, and had received the opinion of Attorney General Garland, of January 19, 1887; that, in the light of such new testimony and of the opinion of the Attorney General, the Secretary decided that

iron ore, as known to the commerce of the United States, was the ore in its natural state in respect to moisture; and that the instructions of October 29, 1886, were therefore revoked, and the collector was directed to assess duty on the actual weights as reported by the United States weigher at the time of importation; but that, in the case of importations of iron ore which importers might claim had been increased in weight on the voyage by the addition of sea water, the regulations of the Department applied, and importers, on making due application thereunder, might obtain such allowance as might be estimated and reported by the United States appraiser.

No statute of the United States, in force when the importations in question were made, recognized any deduction from the weight of iron ore when imported, because of its containing moisture. The ore was weighed by the government's officers at the ship's side, and the weight so taken was entered in a book and became a public record of the government weight of the importation. No statute authorized a deduction from such government weight in imposing the duty of 75 cents a ton on the ore.

It appeared by the evidence that dried ore was an article unknown to commerce or trade; and the evidence was clear that the allowance between dealers for the moisture that would be expelled by heating the ore to 212° Fahrenheit, had been based on contract and stipulation, and that no custom existed authorizing such allowance, even among dealers, except where the express conditions of the contract authorized such an allowance. But this whole question, in connection with the fact that the evidence showed that no such custom as an allowance for moisture was ever applied to a purchase or sale of American iron ore, even by a stipulation in a contract, and that some foreign ores were always sold by the ton and without allowance, was submitted to and passed upon by the jury, under a proper charge.

The evidence shows that water, mechanically mixed, is one of the natural and constant constituents of the iron ore of commerce, both domestic and foreign; and that there is no warrant for the conclusion that the iron ore of the statute is

limited to dry ore, or ore with such mechanically mixed water excluded. A verdict to the contrary would have been entirely unsupported by the evidence.

The claim of the plaintiff is really for an allowance by the government upon the government weight of the article imported, in the condition in which the plaintiff imported it, with a view to making it a different article from what it was when the importer presented it to the weigher. By § 2890 of the Revised Statutes, the weigher is to make a return of the articles weighed by him out of a vessel, within three days after the vessel is discharged, and such return is to be made in a book prepared by the weigher for that purpose, and kept in the custom house. Under the statute, the weight so ascertained and recorded becomes the government weight of iron ore, for the purpose of imposing thereon the duty of 75 cents a ton, in the absence of a contrary provision in the statute. Any allowance between dealers is shown to have been based upon an agreement previously made to allow for moisture.

The importer has the right to introduce iron ore only on complying with the statute, and that authorizes the entry only upon payment of a duty of 75 cents per ton upon the article brought in; and the ton is 2240 pounds, by § 2951 of the Revised Statutes. It is a necessity that all ore should have some moisture mechanically mixed with it; and the statute is silent as to the moisture mechanically mixed or chemically combined with the iron ore.

It appears that no alleged custom of dealers controls a carrier as to the payment of freight for the transportation of the imported iron ore, but the charge for transportation is by the actual weight, including the water.

The provision of § 2927 of the Revised Statutes, as carried out by the regulations of the Treasury Department, protects the importer from losses by reason of water, if he employs the methods prescribed for such protection. Such methods exclude the non-statutory method sought to be applied in the present case.

The duty of 75 cents per ton on iron ore containing such quantity of water as it may contain, applies equally to the

duty per ton imposed by the act of 1883 on imported hay, as to which no method is provided by statute for an allowance for the moisture contained in it, except as provided in regard to imports damaged by water. In each case, the duty is imposed on the weight of the article brought in. The principle is different from that in regard to dirt clinging to the skin of a potato, or clay, sand, and gravel mixed with flaxseed. In those cases, the dirt, clay, sand, and gravel are plainly discoverable and readily eliminated, and do not inhere in the article as moisture does in iron ore or in hay.

Reference is made by the counsel for the plaintiff in error to the provision of Schelude C of the act of October 1, 1890, c. 1244, (26 Stat. 567, 574,) paragraph 133, which imposes a duty of 75 cents per ton, on " iron ore, including manganiferous iron ore, also the dross or residuum from burnt pyrites," and which further provides " that in levying and collecting the duty on iron ore, no deduction shall be made from the weight of the ore on account of moisture which may be chemically or physically combined therewith." It is contended that this provision of the tariff act of 1890 is a legislative interpretation, which shows that Congress did not consider the term " iron ore," when used alone, as in the act of 1883, broad enough to embrace water held in mechanical combination; that this is a recognition by Congress that the term in the act of 1883 did not include water mechanically or physically present in the iron ore; and that, under that act, an allowance ought properly to be made in ascertaining the dutiable weight at the custom house, from the fact of the provision in the act of 1890 that such allowance should not be made thereafter.

But it is manifest, from the history of the importation of the article, as shown in the proceedings of the Treasury Department in regard to it, above set forth, that the provision of the act of 1890 was inserted to save further trouble as to the question. The rule, claimed by the plaintiff to be applicable, would exclude from the government weight water chemically combined, as well as that physically mixed, with the iron ore, for the proviso, being that no deduction shall be

made from the weight on account of moisture "chemically
or physically" combined with the ore, if regarded as evidence
that the act of 1883 allowed for moisture physically or mechan-
ically combined, would also show that the act of 1883 allowed
for water chemically combined.  No statute in regard to iron
ore ever permitted an allowance for the water chemically
combined with it; and the act of 1883 must have the same
construction in regard to all moisture, however mixed or com-
bined with the ore.

The rule is invoked by the plaintiff in error, which is set forth
in *Hartranft* v. *Wiegmann*, 121 U. S. 609, 616, that if the question
in regard to a rate of duty is one of doubt, the doubt is to be
resolved in favor of the importer, as duties are never imposed
upon the citizen on vague or doubtful interpretations.  In the
present case, the imposition of the duty is distinct and clear,
and there is no doubtful interpretation; and the rule does not
apply, for the reason that the importer seeks to obtain an
allowance in reduction of a duty which is distinctly imposed.

It is stated in the brief for the plaintiff in error that, as the
Circuit Court ruled that the ordinary definition of the term
"iron ore" included water mechanically present, the burden
was on the plaintiff to satisfy the jury that the interpretation
given to the term among commercial men did not include
such water; that the plaintiff was to fail or prevail as the jury
interpreted the meaning of the term in commerce to be the
mass inclusive or exclusive of the water; and, that if, on the
whole evidence, the jury were in doubt as to what was the proper
interpretation, that doubt should have been resolved in favor of
the importer.

But, the burden of proof being on the plaintiff to prove the
interpretation he contends for to be the true one, he could
not be entitled to a verdict so long as he failed to satisfy the
jury, by a preponderance of evidence, that his interpretation
was the correct one.  The question of doubt referred to in
*Hartranft* v. *Wiegmann*, 121 U. S. 609, 616, is a doubt of a
very different character; and is as to whether, as matter of
legal construction, and not as matter of fact, the article is
within the terms of the statute.  The intention of Congress

to impose a duty of seventy-five cents a ton on the weight of iron ore is expressed in clear and unambiguous language. *American Net and Twine Co.* v. *Worthington,* 141 U. S. 468, 474.

The evidence put in on the part of the defendant, and objected to by the plaintiff, that the iron ores of the United States which resemble, and were like, and had the same characteristics as, the imported iron ores in question, were dealt in in the United States without an allowance for moisture, was justified by the evidence which had been put in on the part of the plaintiff; and the explanation made by the court, as before set forth, that the testimony was received as bearing directly upon the weight and credibility of the testimony on the part of the plaintiff, was sound. The evidence, too, was proper under the claim of custom set up by the plaintiff.

We see no ground for a reversal of the judgment, and it is

*Affirmed.*