AMERICAN SUMATRA TOBACCO CORPORATION *v.* JOSEPH M. TONE, ADMINISTRATOR, ET AL.

AVERY, BROWN, JENNINGS and ELLS, Js.[1]

---

[1] By agreement of counsel this case was argued before and decided by four judges.

Argued June 13—decided July 25, 1940.

*Harry Silverstone,* assistant attorney general, with whom, on the brief, was *Francis A. Pallotti,* attorney general, for the appellant (defendant).

*Harry L. Nair,* with whom, on the brief, was *Solomon Elsner,* for the appellee (plaintiff).

JENNINGS, J.  The plaintiff is a grower and packer of Connecticut valley shade tobacco known as type 61a.  On May 9, 1939, the defendant made an assessment upon the plaintiff for the payment of contributions in respect to the wages paid by it to the persons employed by it in the warehouses where the tobacco was packed.  The plaintiff appealed.  The act under which demand was made (General Statutes, 1939 Supplement, § 1334e) exempts agricultural labor from the operation of the act.  The precise question raised by this appeal is whether the wages in question were paid to employees engaged in processing and packing the tobacco "as an incident to ordinary farming operations as distinguished from manufacturing or com-

mercial operations," under a regulation promulgated by the administrator pursuant to the act.

The general set-up is described, the pertinent statutes are cited, the controlling regulation of the administrator is quoted and many of the relevant cases are discussed in the recent case of *H. Duys & Co., Inc.* v. *Tone,* 125 Conn. 300, 5 Atl. (2d) 23. That case decided that the regulation is constitutional and the exercise of a valid delegation of legislative power and that a conclusion that it is not within the purview of the act was erroneous (page 312), but that as Duys & Company was not a grower but packed the tobacco grown by others through the labor of its own employees for a commission and expenses, it was not within the exemption. The plaintiff in the case at bar directed its efforts to distinguishing its situation from that case in that it grows its own tobacco and packs it in its own warehouses through the labor of its own employees.

In order to bring out this distinction and its effect, this case was tried at length and a very detailed finding was made. Repeating as little as possible of the description of the general situation in the *Duys* case, the finding may be summarized as follows: The plaintiff is a Delaware corporation producing shade grown tobacco in Massachusetts, Connecticut, Georgia and Florida. This case is concerned only with its operations in Connecticut. It there grows and packs over a thousand acres of tobacco annually. The number of employees varies with the season and at times reaches two thousand. The production and preparation for market of Connecticut valley shade grown tobacco is a complicated, intricate and unique process, costing approximately $800 per acre. It includes the preparation of the seed beds, the preparation and fertilization of the soil where the plant will grow, the

construction of the shade tent, the transplanting of the plants from the seed bed to the field, the cultivation of the plants and the harvesting of the leaves. After the leaves are harvested they are hung in specially constructed tobacco sheds for curing. It is admitted that all of these operations involve agricultural labor and are exempt under the statute.

After the leaves have been cured in the sheds, they are carried to the warehouses where they are laid in large piles, each containing about two tons of tobacco, where they are bulk sweated. This occurs through chemical changes in the leaves themselves with no mechanical or chemical assistance except for an occasional turning of the pile. The leaves are then moistened sufficiently to permit handling and are sorted for color, texture and soundness. Each grade is then separated into sizes and packed into cases containing about two hundred pounds each. These cases are placed in the mulling room where temperature and relative humidity are controlled for the purpose of drying out the moisture applied during the sorting and sizing process and the tobacco is allowed to ferment slowly. When the mulling is complete the tobacco is baled in a hand press. It remains in the bale for four weeks and is then, for the first time, ready for market. The various steps involved in preparing the tobacco for sale are necessary steps in one continuous operation, which must be entirely completed for the tobacco to be marketable.

Large quantities of hay, oats and corn are grown by the plaintiff for feeding its livestock and for sale to others. It owns and operates four warehouses. Two are located on farms owned and operated by the plaintiff, a third is on a farm owned and formerly operated by the plaintiff and the fourth is in East Hartford, central to several of the plaintiff's farms. At least half

of those employed by the plaintiff in its warehouses also work on its farms in connection with the growing, harvesting and shed-curing of its crops. Ordinarily a farmer who grows less than one hundred acres of shade does not pack his own tobacco but makes arrangements with some owner of a warehouse to complete for him the process of packing and curing. The percentage of the total crop grown by farmers in this class is very small.

The wages of certain clerks and maintenance men were included in the assessment. It was found that these services are essential to the cultivation, packing and marketing of the tobacco. This finding was assigned as error but was not pursued on the brief and is therefore not discussed.

On these facts the trial court came to the decisive conclusion that the work carried on by the plaintiff in its warehouses in preparing its annual crop of tobacco for market was an incident to ordinary farming operations as distinguished from manufacturing or commercial operations within the meaning of the regulation in question. The defendant claims that the finding should be corrected and that, even as made, it does not support the conclusion.

The attack on the finding is of sufficient importance to merit special consideration. In effect, it aims to show a distinct break and change in the plaintiff's operations at the point where the tobacco is taken from the sheds to the warehouses. The method used is to seek to have stricken out the findings that there is no market for the tobacco at that time and that the various steps taken by the plaintiff are a part of one continuous operation. Both of these findings are supported by the evidence. While it is true that almost anything can be sold at a price and that in fact tobacco has been sold before being taken to the ware-

houses for packing, its peculiar nature prevents the possibility of any fair appraisal at that time. The prices paid for Connecticut shade vary from ten cents a pound to $5.25 a pound. The price which it will ultimately bring depends on color, texture, quality, taste and size. None of these, with the possible exception of size, are determinable at this point in its development. It follows that the finding that there is no market for the tobacco at this time is a reasonable one. As for the continuity of the operations, there was abundant proof that stopping them at any point short of completion would result in spoiled and valueless tobacco.

The remaining question is whether the finding supports the conclusion referred to. The general scope and purpose of the Connecticut act and its relation to similar federal legislation is fully discussed in the *Duys* case. We are here concerned with the narrower point, whether the laborers whose wages were the measure of contribution were engaged in ordinary farming operations as distinguished from manufacturing or commercial operations.

The original federal act, like the Connecticut act, exempted agricultural labor without defining the term. The definition in the *Duys* case at page 311 need not be repeated here. The difficulties resulting in the administration of the act were recognized in Congress and an amendment was passed to clarify the scope of the exemption. Its applicable portion reads as follows [§ 1607 (*l*), Chap. 9, Internal Revenue Code, 26 U. S. C. A. § 1607 (*l*), p. 406]: "The term 'agricultural labor' includes all services performed— . . . (4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultural commodity;

but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits or vegetables, as an incident to the preparation of such fruits or vegetables for market." Since this definition still contains the term "incident to ordinary farming operations," it would not greatly advance the inquiry had it not been passed pursuant to a report of congressional committees defining it. This definition is contained in a discussion of the amendment in Senate and House Committee Reports, 76th Congress, 1st Session, House Report No. 728, p. 53; Senate Report, No. 734, p. 63, and is as follows: "The expression 'as an incident to ordinary farming operations' is, in general, intended to cover all services of the character described in the paragraph which are ordinarily performed by the employees of a farmer . . . as a prerequisite to the marketing, in its unmanufactured state, of any agricultural or horticultural commodity produced by such farmer . . ." The proviso in this definition requiring that the produce shall be "in its unmanufactured state" ties into the Connecticut regulation providing that the operations shall be "carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations." The definition of manufacturing therefore becomes important.

Nothing was done to this tobacco from the time it left the field until it was packed except to permit it to cure itself. The leaf which was ultimately packed was the same leaf in size and shape as grew in the field. Nothing had been added and nothing taken away. It is still a leaf of tobacco. Manufacturing has been defined as "the production of articles for use from raw or prepared materials by giving these materials new forms, qualities, properties or combinations, whether by hand labor or machine." 38 C. J.

966, § 3; 26 Words & Phrases, Permanent Edition, 416. See also *Lawrence* v. *Allen,* 48 U. S. (7 How.) 785, 794; *Seeberger* v. *Castro,* 153 U. S. 32, 34, 14 Sup. Ct. 766. In *Louisville* v. *Ewing Von-Allmen Dairy Co.,* 268 Ky. 652, 655, 105 S. W. (2d) 801, 802, the definition from Webster's New International Dictionary "To work, as raw or partly wrought materials, into suitable forms for use" was approved. Applying the definition it was held that a corporation engaged in pasteurizing milk was not engaged in manufacturing because "the milk, after the pasteurization is complete, contains the same ingredients as it had in it when it came from the cow." So in *Frazee* v. *Moffitt,* 20 Blatch. (U. S.) 267, 272, in deciding that baled hay was not manufactured, it is said that ". . . hay is the same article it was when it was stalks of grass with roots in the earth. It is dried, to be sure. But the drying and any conversion of starch into sugar are mere incidents of the necessary cutting to enable it to be stored for food in latitudes where grass cannot be found all the year round." The idea underlying the word is that material shall be worked on to effect a change in its form or nature. When ready for market, the tobacco was still in its unmanufactured state.

The Connecticut regulation also uses the term "commercial operations" in contradistinction to "ordinary farming operations." This term also has different meanings according to the situation to which it is applied but the important element is that of buying, selling and exchange in the market. *Earnshaw* v. *Cadwalder,* 145 U. S. 247, 258, 12 Sup. Ct. 851; *Beard* v. *Board of Education,* 81 Utah 51, 78, 16 Pac. (2d) 900. There is nothing in the operations of the plaintiff which brings them within this term.

This analysis, based on the congressional definition, is, in general supported by the decided cases. Little

conflict appears and such as there is can be explained by the different states of facts involved or the wording of the statute or regulations. Whether the activities under investigation are incident to ordinary farming operations as defined in the regulation, or are manufacturing or commercial operations, depends on the facts of the particular case and no definite rule of general application can be evolved.

Such general observations in the *Duys* case as are relied on by the defendant are to be interpreted in the light of the facts in that case. Duys & Co. was a middleman standing between the producer and the dealer. *Keeney* v. *Beasman,* 169 Md. 582, 588, 182 Atl. 566, cited on page 310 of the *Duys* case, makes the distinction clear. The farmer in that case was producing, processing and selling milk; his farm hand was held to be engaged in agricultural labor, but if his employer had been engaged in manufacturing milk products independently of the farm, his employee would not have been engaged in agricultural labor. Similarly, in the *Duys* case, it was because the work was done apart from and independently of the farms instead of by employees of the owner and as an incident to ordinary farming operations that the employees were held not to be within the exception.

There are numerous cases fully supporting the plaintiff's position, among which are *United States* v. *Turner Turpentine Co.,* 111 Fed. (2d) 400; *Matter of Butler,* 258 App. Div. 1017, 16 N. Y. Sup. (2d) 965; *Industrial Commission of Colorado* v. *United Fruit Growers Association,* 106 Colo. 223, 103 Pac. (2d) 15 (distinguishing the *Duys* case); *Bucher* v. *American Fruit Growers Co.,* 107 Pa. Superior Ct. 399, 403, 163 Atl. 33 (workman's compensation).

Admitting the remedial character of the act (*Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495,

515, 57 Sup. Ct. 868) and the fact that exceptions to the general policy of the law are to be strictly construed (*DeCarli* v. *Manchester Public Warehouse Co.*, 107 Conn. 359, 364, 140 Atl. 637), the conclusion of the trial court that the plaintiff is exempt was one which it could reasonably reach on the facts found and is supported by reason and authority.

There is no error.

In this opinion the other judges concurred.