THE CONNECTICUT WATER COMPANY *v.* PASQUALE A. BARBATO, ACTING COMMISSIONER OF REVENUE SERVICES
(13166)

HEALEY, SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued December 4, 1987—decision released February 23, 1988

*Scott P. Moser,* with whom were *Thomas R. Webb* and, on the brief, *William G. DeLana,* for the appellant (plaintiff).

*Jonathan L. Ensign,* assistant attorney general, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Jane D. Comerford,* assistant attorney general, for the appellee (defendant).

COVELLO, J. This is the appeal from an assessment of a sales and use tax upon goods and services used by the plaintiff, the Connecticut Water Company, in the course of the construction of two water treatment plants. The plaintiff claims that the goods and services are exempt from taxation. The matter was reserved for the advice of this court on a stipulation of the following facts.

The plaintiff sells drinking water. Between 1979 and 1982, it constructed two water treatment plants, one in Clinton and the other in Chester. At these facilities, untreated or raw water that is unsuitable for drinking is drawn from reservoirs and collected in rapid mixing tanks in which hydrated lime and other agents that assist in the removal of suspended solids are added. Thereafter, the water passes through a pulsator clarifier unit (Clinton facility only) and certain filtration media, both of which serve to remove significant amounts of

organic solids and other foreign material. In addition, this process assists in the correction of the water's odor and taste. A number of chemical compounds not present in the untreated water are added and thereafter remain present through to consumption. The entire process involves the use of basins, tanks, buildings, structures, pipes and a variety of machinery. Among the structures are certain water tanks known as "clearwells" in which finished water is held prior to its distribution by gravity feed through mains and pipes to the plaintiff's customers.

The plaintiff made a timely petition to the defendant commissioner of revenue services for a reassessment of the sales and use tax assessed by him. Upon the defendant's denial of this petition, the plaintiff appealed to the Superior Court pursuant to General Statutes § 12-422.[1]

---

[1] "[General Statutes] Sec. 12-422. APPEAL. Any taxpayer aggrieved because of any order, decision, determination or disallowance of the commissioner of revenue services under section 12-418, 12-421 or 12-425 may, within one month after service upon the taxpayer of notice of such order, decision, determination or disallowance, take an appeal therefrom to the superior court for the judicial district of Hartford-New Britain, which shall be accompanied by a citation to the commissioner of revenue services to appear before said court. Such citation shall be signed by the same authority, and such appeal shall be returnable at the same time and served and returned in the same manner, as is required in case of a summons in a civil action. The authority issuing the citation shall take from the appellant a bond or recognizance to the state of Connecticut, with surety to prosecute the appeal to effect and to comply with the orders and decrees of the court in the premises. Such appeals shall be preferred cases, to be heard, unless cause appears to the contrary, at the first session, by the court or by a committee appointed by it. Said court may grant such relief as may be equitable and, if such tax has been paid prior to the granting of such relief, may order the treasurer to pay the amount of such relief, with interest at the rate of six per cent per annum, to the aggrieved taxpayer. If the appeal has been taken without probable cause, the court may tax double or triple costs, as the case demands; and, upon all such appeals which are denied, costs may be taxed against the appellant at the discretion of the court, but no costs shall be taxed against the state."

The questions reserved for the advice of this court are: (1) Is the transformation of raw water into finished, potable water at the company's treatment plants a process that constitutes "manufacturing" within the meaning of General Statutes § 12-412 (34)?[2] and (2) Are certain tanks known as "clearwells," which are used as the initial distribution point for delivery of potable water to the company's customers, exempt from the sales and use tax pursuant to General Statutes § 12-412 (18)?[3] We answer the first question "no" and the second question "yes."

I

General Statutes (Rev. to 1981) § 12-412 (hh), which was in effect at the time of the defendant's assessment, provided an exemption from the sales and use tax for

[2] "[General Statutes] Sec. 12-412. EXEMPTIONS. Taxes imposed by this chapter shall not apply to the gross receipts from the sale of and the storage, use or other consumption in this state with respect to the following items . . . .

"(34) Machinery used in manufacturing or agricultural production. Sales of and the storage, use or other consumption of machinery used directly in a manufacturing or agricultural production process. The word 'machinery' as used in this subsection means the basic machine itself, including all of its component parts and contrivances, such as belts, pulleys, shafts, moving parts, operating structures and all equipment or devices used or required to control, regulate or operate the machinery, but excluding office equipment or data processing equipment other than numerically controlled machinery used directly in the manufacturing process."

[3] General Statutes § 12-412 (18) grants an exemption from tax for: "Production materials. Sales of and the storage or use of materials, rope, fishing nets, tools and fuel or any substitute therefor, which become an ingredient or component part of tangible personal property to be sold or which are used directly in agricultural production or in the fishing industry or in an industrial plant in the actual fabrication of the finished product to be sold. For the purpose of this subsection, the raising of poultry and livestock shall be construed to be included in the term 'agricultural production.' Sales of and the storage or use of materials, tools and fuel or any substitute therefor, when such products are used directly in the furnishing of power to an industrial manufacturing plant or in the furnishing of gas, water, steam or electricity when delivered to consumers through mains, lines or pipes."

"[s]ales of and the storage, use or other consumption of machinery used directly in a manufacturing or agricultural production process."[4] The plaintiff argues that its water treatment equipment is machinery used in a manufacturing process.

While there is no statutory definition of "manufacturing," § 12-426-11b (a) (10) of the regulations of Connecticut state agencies provides that " '[m]anufacturing' shall mean the performance as a business of an integrated series of operations which places personal property in a *form, composition or character* different from that in which it was acquired for sale in the regular course of business by the manufacturer. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, nature and use. Operations such as compounding or fabricating are illustrative of the types of operation which may result in such a change. 'Manufacturing' is an activity which shall occur *solely at an industrial plant.*" (Emphasis added.)

Section 12-426-11b (a) (7) of the regulations of Connecticut state agencies in turn provides that an " '[i]ndustrial plant' shall mean a manufacturing facility at which a *manufacturing production process is occurring. . . .*" (Emphasis added.) A "manufacturing production pro-

---

[4] General Statutes (Rev. to 1981) § 12-412 (hh) provides: "Machinery used in manufacturing or agricultural production. Sales of and the storage, use or other consumption of machinery used directly in a manufacturing or agricultural production process. The word 'machinery' as used in this subsection means the basic machine itself, including all of its component parts and contrivances, such as belts, pulleys, shafts, moving parts, operating structures and all equipment or devices used or required to control, regulate or operate the machinery, but excluding office equipment or data processing equipment other than numerically controlled machinery used directly in the manufacturing process." This statute has been recodified as General Statutes § 12-412 (34), and the identical language has been retained. See footnote 2, supra.

cess" is defined by these same regulations as "any one of a series of production activities, beginning with the movement of the raw materials after their receipt, inspection and storage, to the first production machine and ending with the completion of the finished product, including any packaging operations, for its sale to the ultimate consumer. . . ." Regs., Conn. State Agencies § 12-426-11b (a) (11).

The plaintiff claims that the present controversy should be resolved in its favor based upon the ruling in *Ziperstein* v. *Tax Commissioner,* 178 Conn. 493, 423 A.2d 129 (1979). In that case, we held that electricity used in the preparation of various ice milk and frozen slush products was exempt from sales tax, having been used in "a process of manufacturing tangible personal property for sale in the regular course of business" as then provided in § 12-426-11 (g) of the regulations of Connecticut state agencies. Id., 499. The ice milk in issue was "produced by taking a commercially prepared liquid mixture of sugar, corn syrup and other items, and whipping air into the mixture and passing it through refrigerating machinery . . . . The . . . 'slush' . . . drink [was] made by mixing water, sugar, flavoring and chemical additives in a walk-in cooler where the product is stored until pumped from a machine." Id., 499–500.

Since a "process of manufacturing" had neither a statutory nor regulatory definition at the time, we applied the commonly understood meaning of the phrase and found the production of the plaintiff's products to be a "process of manufacturing" because "raw materials are transformed from an intrinsically valueless state into a finished product which has an *enhanced value and use* . . . ." (Emphasis added.) Id., 500.[5] Relying on *Ziperstein's* emphasis on enhanced

---

[5] In the present case, there is really only one raw material, i.e., the water. There is, therefore, a significant factual distinction between this case and *Ziperstein* v. *Tax Commissioner,* 178 Conn. 493, 423 A.2d 129 (1979).

value and use, the plaintiff claims that its conversion of raw water to potable water is analogous to the production of the dairy bar products in that case.

The defendant argues that after the *Ziperstein* ruling, § 12-426-11b (a) (10) of the regulations of Connecticut state agencies was promulgated, defining "manufacturing" in a narrower context with a different focus.[6] The defendant claims that the processing of potable water does not place personal property in "a form, composition or character different from that in which it was acquired for sale" as the regulation now requires. The defendant further claims that the plaintiff's process does not meet this regulation's requirement that "[t]he change in form, composition, or character must be a substantial change, and it must result in a *transformation of property into a different product having a distinctive name, nature and use.*" (Emphasis added.) See footnote 6, supra. We agree.

"It is a settled rule of law that statutes which exempt from taxation are to be strictly construed against the party claiming an exemption." *Hartford Hospital* v. *Board of Tax Review,* 158 Conn. 138, 147, 256 A.2d 234 (1969); *Clinton Nurseries, Inc.* v. *Commissioner of Revenue Services,* 205 Conn. 761, 764, 535 A.2d 361 (1988); *Ziperstein* v. *Tax Commissioner,* supra, 496. "[N]o claimant is entitled to an exemption unless he satisfies all the statutory requirements." *Renz* v. *Monroe,* 162

---

[6] Section 12-426-11b (a) (10) of the regulations of Connecticut state agencies, which became effective April 7, 1980, provides: " 'Manufacturing' shall mean the performance as a business of an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired for sale in the regular course of business by the manufacturer. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, nature and use. Operations such as compounding or fabricating are illusrative of the types of operation which may result in such a change. 'Manufacturing' is an activity which shall occur solely at an industrial plant."

Conn. 559, 562–63, 295 A.2d 558 (1972). Further, in the absence of any evidence to the contrary, we may assume that this regulation's submission to the legislative regulation review committee and its subsequent ratification "[support] the position that the regulation is consistent with the general statutory scheme that the regulation was designed to implement." *Texaco Refining & Marketing Co.* v. *Commissioner of Revenue Services,* 202 Conn. 583, 600, 522 A.2d 771 (1987).

This regulation's requirement for a change in "form, composition, or character" to the end that there has been a "transformation of property" is consistent with our holding in *American Sumatra Tobacco Corporation* v. *Tone,* 127 Conn. 132, 15 A.2d 80 (1940). There, we concluded that the numerous steps required in preparing shade grown tobacco for market did not constitute a manufacturing operation even though stopping the operation "short of completion would result in spoiled and valueless tobacco." Id., 137. Despite the fact that "[t]he production and preparation for market of . . . shade grown tobacco is a complicated, intricate and unique process"; id., 134; we reasoned that "[it was] still a leaf of tobacco." Id., 138. Similarly, despite the complexity of the equipment and procedures used by the plaintiff to render its water potable, the fact remains that the plaintiff's eventual product is still water and it does not carry the "distinctive name [and] nature" required by the regulation. Therefore, the transformation of raw water into finished, potable water at the company's treatment plant is not a process that constitutes "manufacturing" within the meaning of General Statutes § 12-412 (34).[7]

[7] We conclude that the test of "enhanced value and use" set forth in *Ziperstein* v. *Tax Commissioner,* 178 Conn. 493, 500, 423 A.2d 129 (1979), has been superseded and replaced by the later, more comprehensive regulation defining manufacturing, § 12-426-11b (a) (10) of the regulations of Connecticut state agencies.

## II

General Statutes (Rev. to 1981) § 12-412 (r) further provided an exemption from the sales and use tax for "materials . . . when such products are used directly in the furnishing of . . . water . . . when delivered to consumers through mains, lines or pipes." The issue presented here is whether the plaintiff's "clearwells" are products used *directly in the furnishing* of water, thereby qualifying them for the tax exemption.

The defendant argues that furnishing connotes the act of providing, supplying or giving. Since the "clearwells" are tanks used to hold the processed water, the defendant claims that they are not directly involved in the furnishing of water and therefore are not materials qualifying for the exemption. We disagree.

"In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . ." General Statutes § 1-1 (a). To "furnish" means "to complete, carry out, equip . . . to provide or supply with what is needed . . . ." N. Webster, Third New International Dictionary (1986). "Furnish" implies the provision of essentials required for performing a function. The function involved here is the delivery of water from its seller to the consumer. An element essential to performing this function is a vessel to contain the water until such time as there is a consumer demand for it. Drawing the water from the "clearwell" is as much an integral part of this function as is drawing water from the mains and pipes which comprise the rest of the distribution network. We conclude that the "clearwells" are products used directly in the furnishing of water and thereby qualify for the exemption authorized by the statute.

The answer to question one is: No, the transformation of raw water into finished, potable water at the

company's treatment plant is not a process that constitutes "manufacturing" within the meaning of General Statutes § 12-412 (34).

The answer to question two is: Yes, the "clearwells," which are used as the initial distribution point for delivery of potable water to the company's customers, are exempt from the sales and use tax pursuant to General Statutes § 12-412 (18).

No costs will be taxed to any party.

In this opinion the other justices concurred.