No. 71,465

In the Matter of the Appeal of COLLINGWOOD GRAIN, INC., GARVEY ELEVATORS, INC., and CAIRO COOPERATIVE EQUITY EXCHANGE from an Order of the Director of Taxation on Assessment of Sales Tax and Refund Requests.

(891 P.2d 422)

Opinion filed March 10, 1995.

*John Michael Hale,* of the Kansas Department of Revenue, argued the cause, and *Vernon L. Jarboe,* general counsel, and *Thomas E. Hatten,* of the same department, were on the briefs for appellant.

*Carol B. Bonebrake,* of Cosgrove, Webb & Oman, of Topeka, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal by the Kansas Department of Revenue (KDR) from a final order of the Board of Tax Appeals (BOTA) which held that the sale of electricity consumed in grain elevator operations, such as for aeration, blending, cleaning, and drying of grain, is exempt from sales tax pursuant to K.S.A. 79-3602(m)(B) and K.S.A. 79-3606(n).

Collingwood Grain, Inc., Garvey Elevators, Inc., and Cairo Cooperative Equity Exchange (taxpayers) are grain elevators. In 1989, taxpayers each submitted claims seeking sales tax exemption on future utility bills and refunds of sales tax paid on previous billings pursuant to K.S.A. 79-3606(n). That statute provides for a sales tax exemption on:

"all sales of tangible personal property which is consumed in the production, manufacture, processing, mining, drilling, refining or compounding of tangible personal property, the providing of services or the irrigation of crops for ultimate sale at retail within or without the state of Kansas; and any purchaser of such property may obtain from the director of taxation and furnish to the supplier an exemption certificate number for tangible personal property for consumption in such production, manufacture, processing, mining, drilling, refining, compounding, irrigation and in providing such services."

It is undisputed that electricity is "tangible personal property" subject to the sales tax exemption. K.S.A. 79-3602(m)(B).

The taxpayers' claims were consolidated. The procedural history is of no real significance and will not be set forth in detail. The first hearing occurred in 1989, and subsequently there was a rehearing by BOTA, following remand by the Court of Appeals. BOTA issued its order on remand in February 1994. The order states in pertinent part:

"At harvest, grain is dumped into a pit and is then taken to a storage bin for holding. Following the completion of harvest, the grain elevators begin their

compounding, processing, and refinement activities which include the process of blending/turning, fumigation, cleaning, aeration, grain drying, feed grinding and fertilizer blending. The functions and purposes of each process are often interrelated and are often completed in conjunction with the other processes. The processes available and performed at each elevator vary according to the individual property characteristics of the elevator.

"A. Blending/Turning. The term 'blending' is often used interchangeably with 'turning'; however, for purposes of taxation, such processes are separate and distinct. Blending is the process which takes the grain received in various quality levels and refines, compounds, and processes the grain through cleaning, turning, and dehydration to achieve a more uniform product in terms of moisture level, test weight and protein level. Blending improves the value or marketability of the grain. In contrast, turning is the process by which grain is moved within the bin primarily to dissipate hot spots and prevent spoilage. Although turning will result in some dehydration, the primary purpose of turning is to preserve the grain rather than to create an improved or more marketable product.

"B. Fumigation. Typically, in September or October following harvest, grain is fumigated for the purpose of killing all bugs in the grain. Fumigation is the process whereby fumigants (either liquids or pellets) are added to the grain to kill [insects] and prevent further insect damage. One method of fumigation is to turn the grain and deposit phosphine pellets on the grain as it goes into the bin. Another method of fumigation is through the application of liquid [fumigants] through the aeration system. Aeration fans pull the fumigants through the grain mass. It would appear that the primary purpose of fumigation is to preserve the grain.

"C. Cleaning. Elevators remove foreign matter from the grain by several methods. Some elevators have aspirators whereby the grain passes through these machines and air suction pulls out the foreign matter. Other elevators use rotary cleaners which involve screens through which the grain will pass but the trash will not. Grain is delivered to the screens by means of a centralized elevator leg. It appears that the primary purpose of cleaning is to produce an improved or more valuable product which is more marketable to grain mills.

"D. Aeration. Aeration is used by grain elevators to lower the moisture content (drying) and to control insect infestation. Drying is essential to reduce moisture content so that the grain becomes a marketable product. Specifically, aeration is the process where cold air is pulled through the grain by large fans to lower the temperature of the grain below 50 degrees. Moisture is removed through evaporation. Furthermore, once the temperature of the grain has been lowered below 50 degrees, the insects become dormant. During aeration, the fans typically operate continuously all winter for a period of three to six months. Aeration is commonly used in conjunction with other processes. Aeration is used to produce an improved and more marketable product.

"E. Grain Drying. Grain drying occurs at an elevator when wet grain is received at the receiving pit. The wet grain is elevated by the elevator leg and

taken over to a dryer, a piece of equipment that uses either natural gas or propane running a series of burners. As grain passes over the burners, the heat takes the moisture out. Corn and milo are typically the grains which are dried. Drying is essential for reducing moisture so that the grain becomes a marketable product."

Using the dictionary definitions of "process," "refining," and "compounding," BOTA stated:

"Grain elevators, through blending, mix and combine [(compound)] grains of various grades in order to achieve a high quality product which has a lower moisture level, a more marketable test weight, and a higher protein level and grade. Furthermore, the various cleaning processes, working singularly or in conjunction with other processes, help to reduce and eliminate foreign matter, insect infestation, and damaged grain [(refining)]. Furthermore, the various drying processes working singularly or in conjunction with other processes improve the grain quality, moisture content, test weight, and protein level."

BOTA rejected the KDR's argument that "production, manufacturing, processing, mining, drilling, refining, or compounding" is limited to those processes which result in the physical transformation of the product into an article or product of *substantially different character*. BOTA held that a transformation of tangible personal property into a product of substantially different character is not necessarily required in order to obtain the exemption; it is sufficient if the procedure transforms or converts the product into an improved marketable product. BOTA concluded:

"In this particular case, all of the processes except for turning and fumigation are used to treat, process, and improve the harvested grain into a more marketable and improved product in terms of test weight, protein level, moisture content and grade. Cleaning refines the grain by eliminating foreign matter including damaged grain. Blending, drying and aeration will process and compound the grain into a more marketable product by improving the test weight, protein level, grade and moisture content of the final product. Grain turning and fumigation, however, is performed simply to preserve the grain in its present condition. By grain turning, the grain elevator prevents hot spots and insect infestation. Fumigation merely kills insects that could spoil the grain.

". . . The Board, therefore, concludes that the purchases of electricity used in blending, aeration, drying, and cleaning should be exempt from the retailers' sales tax pursuant to K.S.A. 79-3606(n) and K.S.A. 79-3602(m). . . . The taxpayer's [*sic*] request to exempt purchases of electricity used in grain turning and fumigation, however, should be denied."

The KDR petitioned for reconsideration and rehearing. BOTA declined to alter its order. The KDR timely appealed, and the

appeal was transferred to this court pursuant to K.S.A. 20-3017 on the KDR's motion.

Taxpayers do not cross-appeal from BOTA's determination that electricity used in turning and fumigating is not exempt under K.S.A. 79-3606(n).

## STANDARD OF REVIEW

BOTA orders are subject to judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* See K.S.A. 74-2426(c). The KDR properly acknowledges its burden in this appeal to prove that the action taken by BOTA was erroneous. See K.S.A. 77-621(a). The KDR suggests that BOTA "erroneously interpreted or applied the law"; that BOTA "engaged in an unlawful procedure or . . . failed to follow prescribed procedure"; that BOTA's decision was "based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole"; and that BOTA's decision was "otherwise unreasonable, arbitrary or capricious." See K.S.A. 77-621(c)(4), (5), (7), (8).

## SUBSTANTIAL EVIDENCE

The KDR argues that BOTA's findings of fact are not supported by substantial evidence in the record as a whole. The KDR points out that one ground for reversal of BOTA's decision is if it was "based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 77-621(c)(7). " '[S]ubstantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.' [Citations omitted.]" *Lansing-Delaware Water District v. Oak Lane Park, Inc.*, 248 Kan. 563, 572-73, 808 P.2d 1369 (1991).

The KDR points to numerous treatises which were admitted into evidence. The KDR asserts the treatises show that aeration is not designed to dry the grain and that the aeration fans do not produce enough air flow to dry the grain. It stresses that aeration, turning, and blending are performed in order to cure "hot spots"

which develop when moisture migrates through the stored grain. The hot spots develop even though the moisture content of the grain when it is placed into storage is low enough for extended storage.

It is helpful to summarize the processes of blending, cleaning, drying, and aerating. The evidence in the record describing each of these processes is extensive, and it would be impossible to thoroughly discuss each article or treatise or each witness' testimony concerning these processes.

Grain storage facilities receive grain from farmers after harvest. The grain is placed into storage bins layer upon layer. When initially placed into storage, the grain is not separated by grade, although low-grade grain may be placed into separate bins. A higher quality grain may be layered upon a lower quality grain, and wetter grain may be layered upon a drier layer of grain. Because grain from different sources is layered together, the grain in the bins lacks uniformity. Grain storage facilities "blend" the grain from the same or different bins to achieve a uniform quality of grain. Grain with a high moisture content may be blended with drier grain to produce grain with an acceptable moisture content, and low-grade grain may be blended with high-grade grain in amounts which do not make the high-grade grain lose its high-grade quality but does result in the low-grade grain having a higher value because, if properly mixed, it becomes part of a high-grade grain. Thus, the blending process "improves" the value of the low-grade grain while not decreasing the value of the high-grade grain. Blending, or turning, may also be done to redistribute the grain in a storage unit to break up hot spots and prevent deterioration.

Some grains are typically harvested with a high moisture content. Grain "drying" occurs when the grain passes over burners heated by propane or natural gas and the moisture in the grain evaporates. The grain is then cooled before it is stored. The drying process is necessary for wet grains because grains with a high moisture content deteriorate quickly if not dried before being stored. Ideally, grain is dried enough for safe storage but not too much, as excessively dry grain may crack and therefore be down-

graded. The drying process is not typically used with wheat because wheat is ordinarily sufficiently dry at harvest, though if harvest conditions are wet the wheat may be dried before storage.

"Cleaning" refers to the process by which foreign objects are removed from the grain. Grain may be cleaned in several ways. One way is to pass the grain through a screen which does not permit the foreign material to pass through. Another method is by using dust collectors to suction off the foreign material. One of the downfalls to cleaning grain is that grain may become cracked or broken, reducing the quality of the grain. Through cleaning, insect control may be improved. Storage of grain is made easier if the grain has been cleaned because air passes more easily through the grain, thus reducing the development of hot spots.

One of the problems of storing grain is moisture migration. Grain absorbs moisture from the air or releases moisture into the air. As the temperature of the grain varies, particularly during the winter months when the grain on the outer portions of the storage units cools while the temperature of the grain in the center of the units remains constant, moisture moves through the grain and the grain develops hot spots. Hot spots are areas of grain which have a high moisture content and are prone to spoilage or greater insect infestation. To counter the development of hot spots, grain storage facilities "aerate" the grain. Aeration typically involves a fan which slowly moves air throughout the grain in the storage unit. The process cools the grain mass and reduces moisture migration. When the grain is cooled, insect activity is reduced, as many of the insects supported by the grain do not survive at low temperatures. Aeration can also reduce the moisture content of the grains slightly, although this is not its primary purpose. Aeration is also one of the methods by which grain is cooled after the drying process.

The evidence in the record concerning the various processes at issue is quite extensive. The KDR's main concern appears to be with BOTA's finding that aeration is used to dry the grain. There is evidence in the record that the moisture content of grain may be somewhat reduced through aeration. BOTA's findings are generally supported by the evidence. The crux of the KDR's ar-

gument concerns what effect the various processes must have on the grain for the processes to be considered "production, manufacture, processing, . . . refining or compounding" of grain.

## K.S.A. 79-3606(n)

K.S.A. 79-3606(n) exempts from taxation electricity used in the "production, manufacture, processing, . . . refining or compounding of tangible personal property." The issue is what constitutes "production, manufacture, processing, . . . refining or compounding." BOTA held that to receive the exemption, the statute does not require that the product be transformed into a substantially different product; rather, the terms include the transformation into an improved marketable product.

The KDR first argues that BOTA's construction is incompatible with the construction of sales tax processing exemptions previously adopted by this court. The KDR points to two cases, *Warren v. Fink*, 146 Kan. 716, 72 P.2d 968 (1937), and *R.L. Polk & Co. v. Armold*, 215 Kan. 653, 527 P.2d 973 (1974).

In *Warren*, this court construed a statute which provided that "[s]ales and purchases of electricity, . . . for use in . . . processing, . . . shall be exempt from taxation under this act" and that sales of electricity "made to a person engaged in the business of producing, manufacturing or compounding for sale any article, substance, service or commodity which is actually used in the production, and enters into the processing of, and becomes an ingredient or component part of the article, substance, service or commodity which he manufactures or compounds, produces or furnishes" are exempt. 146 Kan. at 718. The plaintiff, a retail grocer, purchased electricity in order to run the refrigeration system in which he stored meat, milk, vegetables, and other perishable products to preserve the products for sale. This court held that the plaintiff was not a "processor" within the meaning of the act.

"What is done is to preserve these commodities in substantially the same condition. It is quite different from the use of refrigeration to make ice cream from milk and other ingredients, or from making a new or different article by heat. The electric energy purchased by plaintiff is not resold, but is consumed by him in the conduct of his business, just as he might consume electric energy for lights in his store." 146 Kan. at 718.

In *Warren*, the court also denied exemptions to persons who used ice to cool products for sale to the public. 146 Kan. at 718.

*R.L. Polk*, 215 Kan. 653, considered whether film, lithoplates, developer, and other supplies used by a printing plant in printing city directories for retail sale were exempt from taxation as consumable items used in the manufacturing process. The statute at issue was the predecessor to K.S.A. 79-3606(n) and used nearly identical language. See K.S.A. 1970 Supp. 79-3606(m). This court stated:

"Our statutes do not define the term 'manufacture' nor has our case law done so. Webster's Third New International Dictionary supplies this broad definition: '. . . the process or operation of making wares or other material products my hand or by machinery esp. when carried on systematically with division of labor . . . a productive industry using mechanical power and machinery. . . .'

"In 68 Am. Jur. 2d, Sales and Use Taxes, §112, we find this:

'The terms "manufacturing" and "processing" imply essentially a transformation or conversion of material or things into a different state or form from that in which they originally existed—the actual operation incident to changing them into marketable products.' (p. 160.)"

215 Kan. at 656.

The *R.L. Polk* court concluded that the printer's use of the film and other supplies to photograph typed lists of the names and addresses of residents for inclusion in the finished directory was property immediately consumed in manufacturing under the exemption statute.

The KDR points to the definition of "property used in processing" set forth in the Kansas use tax statutes at K.S.A. 79-3702(f):

" 'Property used in processing' within the meaning of this act shall mean and include (1) any tangible personal property which, when used in fabrication, compounding, manufacturing or germination, becomes an integral part of the new article resulting from such fabrication, compounding, manufacturing, or germination, and intended to be sold ultimately at retail; (2) fuel which is consumed in creating power, heat, or steam for processing or for generating electric current."

Sales and use tax statutes should, the KDR reminds this court, generally be construed together. See *Custom Built Homes Co. v. State Comm. of Rev. and Taxation*, 184 Kan. 31, 41, 334 P.2d

808 (1959); *Consumers Co-operative Ass'n v. State Comm. of Rev. & Taxation*, 174 Kan. 461, Syl. ¶ 1, 256 P.2d 850 (1953). The KDR also asserts that the nature of grain elevators as "public warehouses" under K.S.A. 34-223 *et seq.* weighs against finding an exemption here. K.S.A. 34-223 *et seq.* governs the activities of grain elevators in inspecting, sampling, storing, weighing, and grading grain. K.S.A. 34-224 provides that "public warehouse, as used in this act, shall be deemed to mean every elevator or other building in which grain is received for storage or transfer for the public." Taxpayers point out that K.S.A. 34-237 provides that a grain elevator operator may be permitted to dry, clean, or otherwise change the condition or value of grain.

Next, the KDR argues that BOTA's construction violates the rule that tax exemptions are to be strictly construed against exemption and in favor of taxation. It is a well-established rule of construction that tax exemption statutes must be "construed strictly in favor of imposing the tax and against allowing the exemption for one who does not clearly qualify." *Board of Park Comm'rs, City of Wichita v. State, ex rel.*, 212 Kan. 716, 717, 512 P.2d 1040 (1973). The burden is on the person asserting exemption to bring himself or herself within the exemption statute. *See Warren v. Fink*, 146 Kan. 716, Syl. ¶ 1. The KDR suggests that similar rules of construction apply to tax refund statutes: The refund statute must be construed strictly in favor of imposing the tax and against allowing the refund, and the burden is on the person requesting a refund to bring himself or herself within the exemption statute. No valid reason exists to apply a different rule of construction to tax refund statutes. Both refund and exemption statutes serve the same purposes. This court will construe refund statutes strictly against the person seeking such refund. This rule is, of course, subservient to the fundamental rule of statutory construction which requires that the purpose and intent of the legislature govern.

The KDR asserts that sales tax exemptions for manufacturing and processing, such as the exemption at issue here, require the transformation of a product into a state or form that is different from the one in which it originally existed. In addition to *Warren*,

146 Kan. 716, and *R.L. Polk*, 215 Kan. 653, the KDR cites cases from other jurisdictions as well as 68 Am. Jur. 2d, Sales and Use Tax §146, which states:

"The terms 'manufacturing' and 'processing' imply essentially a transformation or conversion of material or things into a different state or form from that in which they originally existed—the actual operation incident to changing them into marketable products. The change in form, composition, or character must be a substantial change and it must result in a transformation of the property into a different product having a distinct name, nature, and use. The common thread in the definition cases is that manufacturing involves the production of an article with a new use different from its original use."

The KDR stresses the language quoted above which indicates that there must be a "transformation of the property into different product having a distinct name, nature, and use."

Other jurisdictions have adopted similar language. In *Connecticut Water Co. v. Barbato*, 206 Conn. 337, 537 A.2d 490 (1988), a regulation defined "manufacturing" as

" 'an integrated series of operations which places personal property in a form, composition or character different from that in which it was acquired for sale in the regular course of business by the manufacturer. The change in form, composition, or character must be a substantial change, and it must result in a transformation of property into a different product having a distinctive name, nature and use.' " 206 Conn. at 341.

This definition was adopted as an administrative regulation by the Connecticut state agency. The court held that materials used in constructing water treatment plants, at which water unsuitable for drinking was made suitable for consumption, were not exempt from the sales tax because the eventual product was still water and it did not have a distinctive name or nature required by the regulation. 206 Conn. at 344. The court cited *American Sumatra Tobacco Corp. v. Tone*, 127 Conn. 132, 15 A.2d 80 (1940), where the same court held that steps taken in preparing shade grown tobacco for market did not constitute a manufacturing operation because, even though failure to complete the process would result in an unmarketable product, the final product after the preparation was still a leaf of tobacco. 206 Conn. at 344. See also *Suburban, Etc. Gas Corp. v. Tawes*, 205 Md. 83, 88, 106 A.2d 119 (1954), where the Maryland court held that adding odorant, to

control odor, and methanol, to prevent freezing, to gas was not "compounding" because "the gas when delivered to the consumer was substantially the same gas as delivered to the taxpayer."

In *Tube Co. v. Glander*, 157 Ohio St. 407, 105 N.E.2d 648 (1952), the Ohio court held that the terms "manufacturing" and "processing" "imply essentially a transformation or conversion of material or things into a different state or form from that in which they originally existed." 157 Ohio St. at 410. The court held that machinery used to transport ore and limestone from the ships on which it is delivered to the storage yard where the ore was blended prior to its introduction into blast furnaces for manufacture into steel pipes and tubular products was not directly used in the manufacturing process. 157 Ohio St. at 411. The court pointed out that no change in the original materials took place by use of the machinery and such operations were preliminary and preparatory to the manufacturing or processing of the materials. 157 Ohio St. at 410-11. *Produce Co. v. Kosydar*, 34 Ohio St. 2d 206, 297 N.E.2d 532 (1973), reached a similar result. The *Produce Co.* court stated, "[M]ere enhancement of value of a product, absent a *change* in 'state or form' from that in which it originally existed, does not constitute 'processing.'" 34 Ohio St. 2d at 211. *Produce Co.* considered the activity of cleaning, candling, grading, oiling, and packaging eggs for sale to retailers. The court stated:

"The operation described herein evidences no change in the state or form of the eggs, regardless of the fact that they may have been enhanced in value. Those eggs which were unfit for consumption when received by the producer remained unfit for consumption; and those eggs which were fit for consumption when delivered to the retailer were fit for consumption at the time they were received." 34 Ohio St. 2d at 211.

See also *Linwood Stone Products Co. v. State Dept. of Revenue*, 175 N.W.2d 393, 395 (Iowa 1970) ("'processing' refers to an operation whereby raw material is subjected to some special treatment by artificial or natural means which changes its form, context, or condition, and results in marketable tangible personal property").

*Beare Co. v. Tennessee Dept. of Revenue*, 858 S.W.2d 906 (Tenn. 1993), recognized a distinction between "processing" and

material handling or storage. The court cited *Produce Co.*, 34 Ohio St. 2d 206, as well as *Warren*, 146 Kan. 716. The court held that "blast freezing," in which fresh or raw food products are quickly frozen, and other handling related to those products constitute "processing" because the condition of the food is changed, but activities related to the mere preservation of prefrozen foods did not constitute "processing." 858 S.W.2d at 909.

Taxpayers argue that they are entitled to an exemption because the processes of blending, cleaning, drying, and aerating grain constitute "processing," "refining," or "compounding." Taxpayers rely on the dictionary definitions of those terms. Taxpayers assert that "processing" refers to action which converts an agricultural commodity into marketable form by some special process, that "compounding" means mixing, combining, or blending, and that "refining" refers to the process of bringing a product to a pure state by removing impurities.

Taxpayers seek to distinguish *Warren*, 146 Kan. 716, and *R.L. Polk*, 215 Kan. 653. Taxpayers argue that in *Warren*, the grocer was merely holding pre-packaged products for resale in the same state in which they were received, whereas the grain elevators transform grain into a marketable product. Taxpayers assert that *R.L. Polk* construed only the definition of "manufacture" and did not construe "processing," "refining," or "compounding." The *R.L. Polk* court did cite a definition of "processing" from Am. Jur. 2d.

Taxpayers cite *Carroll County v. Shriver Co.*, 146 Md. 412, 126 A. 71 (1924), and *Stokely-Van Camp v. State*, 50 Wash. 2d 492, 312 P.2d 816 (1957). *Carroll County* considered whether activities of canning vegetables constituted "manufacturing." The canning process, which included washing ears of corn and removing damaged or immature ears, was held exempt from taxation as a manufacturing process. In *Stokely-Van Camp*, the preparation of fresh fruit and vegetables for packaging and freezing, a process which included cleaning the various fruits and vegetables, was held to be "manufacturing." The court was unable to distinguish between canning vegetables and freezing vegetables, even though the vegetables were cooked as part of the canning

processes but not as part of the freezing process. 50 Wash. 2d at 498.

In *National Lime and Stone Co. v. Kosydar*, 38 Ohio St. 2d 206, 311 N.E.2d 899 (1974), the Ohio court considered the process of producing crushed limestone and related products.

"Raw stone is subjected to several stages of crushing and screening, following which quantities of different sized stone are blended together in proportions specified by purchasers and placed in storage piles. While awaiting delivery, these blends must be periodically mixed in order to maintain an homogenous blend conforming to customer specifications." 38 Ohio St. 2d at 207.

The court concluded that equipment and machinery used in these processes was equipment used in "processing." The court quoted its syllabus in *France Co. v. Evatt*, 143 Ohio St. 455, 55 N.E.2d 652 (1944):

" 'Sales of tangible personal property used and consumed in operations consisting of transporting crushed-stone products from a stone crushing and screening plant to yards adjacent thereto, and of draining, cleaning, blending and reassembling such products to comply with the required specifications of the purchasing trade before they are available and ready for market and sale, are sales of personal property used and consumed directly in the production and processing of tangible personal property for sale.' " *National Lime and Stone Co.*, 38 Ohio St. 2d at 208.

The court held that equipment used by the taxpayer was "directly involved in transforming the stone into a 'state or form' different from that in which it originally existed" and that such use constituted "processing." 38 Ohio St. 2d at 209.

The KDR argues that the blended, cleaned, dried, or aerated grain is not a different product from the original grain. The grain is still "raw unprocessed grain" just as it was before the processes. The cases cited by KDR appear to support its argument. If the terms "production, manufacture, processing, . . . refining or compounding of tangible personal property" require a substantial change in the condition of the product to form a new and distinct product with a different name, then that has not occurred here.

However, KDR places too much reliance on its assertion that the product following blending, cleaning, drying, and aerating was raw unprocessed grain, the same product as before the processes were performed. The finished product is still called "raw unpro-

cessed grain" and is used in the same way and for the same purposes as the raw unprocessed grain prior to these processes and, as such, does not satisfy the test adopted in Am. Jur. 2d and by other courts that the new product have a distinct name, nature, and use. But the new raw unprocessed grain is of a different quality than the grain before the processes are performed. The KDR's construction of the terms "production, manufacture, processing, . . . refining or compounding" is too narrow.

We adopt a broader construction of "production, manufacture, processing, . . . refining or compounding of tangible personal property." A broader construction would not be inconsistent with *Warren v. Fink*, 146 Kan. 716, 72 P.2d 968 (1937). *Warren* did hold that electricity used for refrigeration by a retail grocer was not exempt from taxation under a statute similar to K.S.A. 79-3606(n). However, the use of the electricity in *Warren* was for preservation of products for retail sale. The case at bar is quite different. Taxpayers do not merely preserve the grain for retail sale. Taxpayers are grain warehouses which do more than merely warehouse grain. Taxpayers must prepare the grain for the wholesale market by performing the functions of blending, cleaning, and drying. Aeration does appear to be primarily used for a preservative function. However, unlike the retail grocer who preserves milk for retail sale by keeping it cold, grain elevators must aerate grain to maintain its marketability for wholesale use. Aeration does change the nature of the grain, though to a much lesser extent than does blending, cleaning, and drying.

By performing the processes of blending, cleaning, drying, and aerating grain, taxpayers produce a product different from that which was received by them. The product has an enhanced value. Grain which was previously low-quality grain because it was unclean, too wet, or bad quality may be turned into marketable grain by these processes. If the blending, cleaning, and drying functions are not performed, the grain may rapidly deteriorate and become unmarketable. Even when these processes are performed before the grain is stored, the grain will naturally deteriorate during extended storage unless steps are taken to prevent deterioration. Electricity used by the taxpayers in blending, cleaning, drying,

and aerating again is construed to be exempt from taxation under K.S.A. 79-3606(n) as property consumed in the "production, manufacture, processing, . . . refining or compounding of tangible personal property."

## SUBPOENAS

Prior to the BOTA hearing following remand from the Court of Appeals, the KDR filed several requests for issuance of subpoenas duces tecum. The subpoenas duces tecum were directed to Tom Tunnell and the Kansas Grain and Feed Association (KGFA). Tunnell is the executive vice-president of the KGFA. Neither Tunnell nor KGFA is a party to this case, but Tunnell testified as an expert witness.

The first request was for the following documents:

"a) All books, magazines, articles, seminar material and other such printed material in their possession, custody or control that in anyway [sic] concern biological, chemical or other scientific aspects of the storage or preservation of cereal grains.

"b) All correspondence and other written communications of any nature made at any time by them or received by them that is in their possession, custody or control and that in anyway [sic] concern biological, chemical or other scientific aspects of the storage or preservation of cereal grains.

"c) All books, magazines, articles, seminar material and other such printed material in their possession, custody or control that concern the mechanical, electrical or structural engineering of grain storage elevators or the operation of such elevators.

"d) All correspondence and other written communications of any nature made at any time by them or received by them in their possession, custody or control that in anyway [sic] concern the mechanical, electrical or structural engineering of grain storage elevators or the operation of such elevators.

"e) All written memoranda, studies, research, letters, recommendations, factual summaries, or similar writings prepared or received by them at any time that are in their possession, custody or control and concern or discuss in any manner:

i) aeration of cereal grain,
ii) storage practices of cereal grain,
iii) principles of grain preservation, or
iv) Kansas Grain storage practices."

A second request, filed July 19, 1993, was again directed to Tunnell and the KGFA for production of the same materials.

On August 26, 1993, BOTA issued a preliminary order. It denied issuance of a subpoena duces tecum on the KGFA. BOTA stated, "On its face, the subpoena duces tecum is extremely broad and may be fairly construed to request the production of any and all written or printed documents notwithstanding the content, description or relevancy now in possession of Kansas Grain and Feed Association." BOTA indicated that the request was "so indefinite and broad, it appears to be unduly burdensome." BOTA declined to issue the subpoena duces tecum until the KDR made the request more definite and less burdensome.

The KDR filed a new request for issuance of a subpoena duces tecum directed to the KGFA on August 30, 1993, narrowing the scope of the request slightly:

"a) All newsletters, bulletins and other material printed by or published by the association and supplied to its members for the years 1985 to the present.

"b) All seminar material from whatever source, handbooks from whatever source, and published material from agricultural colleges and their extension services in your possession, custody or control that concern the mechanical, electrical or structural engineering of grain storage elevators or the operation of such elevators.

"c) All written memoranda, studies, research, letters, recommendations, factual summaries or similar writings prepared or received by you at any time that are in your possession, custody, or control and concern or discuss in any manner:
    i) aeration of cereal grain,
    ii) storage practices of cereal grain,
    iii) principles of grain preservation, or
    iv) Kansas grain storage practices."

Tunnell, the KGFA, and taxpayers objected to the subpoena duces tecum, and following a hearing on September 28, 1993, BOTA, concerned with the indefinite and burdensome nature of the modified request, issued an order on October 6, 1993, quashing the subpoena duces tecum with respect to all material except a grain elevator workbook published by the KGFA.

The KDR then made another request on October 7, 1993, for issuance of a subpoena duces tecum directed at Tunnell and the KGFA seeking the following:

"a) All newsletters that were provided by the Kansas Grain and Feed Association or its predecessor organization, the Kansas Grain and Feed Dealers

Association, to their members for the years 1970 to the present, said newsletters having been previously described as being bound annually.

"b) All seminar materials, workshop materials, and other such materials provided by the Kansas Grain and Feed Association or its predecessor organization, the Kansas Grain and Feed Dealers Association, to persons attending seminars and other educational events that were sponsored in whole or in part by the Kansas Grain and Feed Association or by its predecessor organization."

By order on October 8, 1993, BOTA refused to issue the subpoena duces tecum, finding no reason to reverse its October 6, 1993, order. Another request, identical in scope to the last-mentioned request, was filed on November 15, 1993. On November 18, 1993, BOTA issued its order denying the request, finding no reason to reverse its orders of October 6 and 8, 1993.

K.S.A. 74-2437a gives BOTA the authority to issue a subpoena duces tecum. The Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.*, also sets forth the scope of discovery: "Discovery shall be permitted to the extent allowed by the presiding officer or as agreed to by the parties. . . . The presiding officer may issue subpoenas, discovery orders and protective orders in accordance with the rules of civil procedure." K.S.A. 77-522(a).

Both parties cite *Yellow Freight System, Inc. v. Kansas Commission on Civil Rights*, 214 Kan. 120, 519 P.2d 1092 (1974). There, this court considered the subpoena power of the Kansas Commission on Civil Rights (Commission) in the context of investigating a complaint of employment discrimination. The Commission sought production of documents relating to the employment histories of Yellow Freight employees hired during the 10 years preceding the complaint. Both the KDR and taxpayers also cite *Atchison, T. & S. F. Rly. Co. v. Lopez*, 216 Kan. 108, 531 P.2d 455 (1975), where this court again considered the Commission's request for a subpoena duces tecum in its investigation of an employment discrimination complaint, and the KDR further cites *Kansas Commission on Civil Rights v. Carlton*, 216 Kan. 735, 533 P.2d 1335 (1975). The rules of law these cases set forth are summarized as follows:

"The law refuses to apply the stringent relevancy requirements of subpoenas in aid of civil or criminal litigation to administrative agency subpoenas. To uphold a subpoena on the ground of relevancy the law requires only that the inquiry

be one which the administrative agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant." *Atchison, T. & S. F. Rly.*, 216 Kan. 108, Syl. ¶ 6.

"Where there is a possibility of relevancy in documents subpoenaed and there is no showing that the subpoena is unreasonable or oppressive the statutes granting the power to subpoena should be liberally construed to permit inquiry." *Yellow Freight*, 214 Kan. 120, Syl. ¶ 4.

"Administrative subpoenas which have previously been condemned as 'fishing expeditions' are now permitted, and administrative subpoenas may be enforced for investigative purposes unless they are plainly incompetent or irrelevant to any lawful purpose." *Atchison, T. & S. F. Rly.*, 216 Kan. 108, Syl. ¶ 7.

"A district court has power to modify a subpoena duces tecum issued by the Kansas commission on civil rights and thus remove any objectionable features from it while preserving the remainder." *Kansas Commission on Civil Rights*, 216 Kan. 735, Syl. ¶ 7.

In *Yellow Freight*, 214 Kan. at 125, it is also noted by the court that under K.S.A. 60-245(b), the court may quash a subpoena if it is unreasonable and oppressive.

Similar rules have been stated concerning subpoenas issued by the Secretary of Human Resources during an investigation concerning the failure to pay unemployment taxes. See *State ex rel. Wolgast v. Schurle*, 11 Kan. App. 2d 390, 722 P.2d 585 (1986).

These cases indicate more "relaxed" standards of relevancy in the context of administrative investigations as compared to the "stringent" relevancy requirement of K.S.A. 60-245(b) for purposes of litigation. Here, however, BOTA is acting in an adjudicatory rather than investigatory manner. See *Atchison, T. & S. F. Rly. Co. v. Commission on Civil Rights*, 215 Kan. 911, 529 P.2d 666 (1974) (distinguishing between the investigatory and adjudicatory functions of administrative agencies).

In any event, the enforcement of a subpoena duces tecum is left to the discretion of the enforcing tribunal. In *Cessna Aircraft Co. v. Kansas Comm'n on Civil Rights*, 229 Kan. 15, 622 P.2d 124 (1981), this court discussed enforcement of a subpoena duces tecum by a district court, again where the subpoena was sought by the Commission as part of an employment discrimination investigation. The Commission sought records from Cessna concerning some 5,399 employees. Restating the *Yellow Freight* test for subpoenas duces tecum issued by agencies, this court also

reiterated that "the subpoena power of the KCCR is subject to K.S.A. 60-245(b) and cannot be unreasonable or oppressive." 229 Kan. at 27. The court acknowledged the district court's power to quash or modify a subpoena if the court finds it is unreasonable or oppressive. Although the statute granting the subpoena power to the Commission must be construed liberally, the court warned that the rule of liberal construction "is not to say that the KCCR has unlimited subpoena powers and can subject an entire facility to demands or whims without some showing of relevancy to the investigation." 229 Kan. at 28.

Concerning the rule stated in *Atchison, T. & S. F. Rly.*, 216 Kan. 108, Syl. ¶ 7, that "[a]dministrative subpoenas which have previously been condemned as 'fishing expeditions' are now permitted, and administrative subpoenas may be enforced for investigative purposes unless they are plainly incompetent or irrelevant to any lawful purpose," the *Cessna* court stated:

"While that is the rule, it does not mean the KCCR may throw its line in just anybody's pond without some minimal justification or expectation that there may be some fish in the pond. The limits of the subpoena power of the KCCR are, by statute, subject to the sound discretion of the trial court. [Citation omitted.]" 229 Kan. at 28.

Finally, in discussing the determination of the relevancy of the material sought by a subpoena duces tecum, we said this:

"While we are not saying that the burden is upon the KCCR in the first instance to justify its subpoena requests, when the same do become an issue before the trial court, some showing of relevancy should be made if a trial court is to have a basis to determine whether the subpoena is unreasonable or oppressive." 229 Kan. at 29-30.

We found that the trial court did not abuse its discretion in modifying the subpoena duces tecum issued by the Commission.

*Cessna Aircraft* makes it clear that the enforcement of a subpoena duces tecum is discretionary, even under the relaxed relevancy standards established for administrative subpoenas for investigatory purposes. Likewise, BOTA must have discretion in enforcing subpoenas duces tecum filed by the KDR in an action under the KJRA for review of a tax assessment. A subpoena duces tecum is subject to K.S.A. 60-245(b), and it must be relevant and

not unreasonable or oppressive. The KDR does not have unlimited subpoena powers without some showing of relevancy. See *Cessna Aircraft*, 229 Kan. at 28.

We cannot say BOTA was in error in holding the subpoenas duces tecum were overbroad, indefinite, and oppressive and were not designed to obtain relevant material.

Affirmed.