******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KOBYLUCK BROTHERS, LLC, ET AL. *v.* PLANNING
AND ZONING COMMISSION OF
THE TOWN OF WATERFORD
(AC 37732)

DiPentima, C. J., and Prescott and Agati, Js.

*Argued March 8—officially released August 2, 2016*

(Appeal from Superior Court, judicial district of New
London, Handy, J.)

*Michael A. Zizka*, with whom was *Kari L. Olson*, for
the appellants (plaintiffs).

*Nicholas F. Kepple*, with whom were *Sandra Beck Dombro* and, on the brief, *Robert A. Avena*, for the appellee (defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiffs, Kobyluck Brothers, LLC (Kobyluck Brothers), and Kobyluck Construction, Inc. (Kobyluck Construction), appeal from the judgment of the trial court affirming the decision of the defendant, the Planning and Zoning Commission of the Town of Waterford (commission), denying the plaintiffs' special permit and site plan application.[1] The plaintiffs claim that the court incorrectly interpreted the term "manufacturing" as used in the Waterford Zoning Regulations (regulations) to preclude the production of construction aggregate.[2] We agree, and, accordingly, reverse the judgment of the trial court.

The record reveals the following relevant undisputed facts and procedural history. Kobyluck Brothers owns 28 Industrial Drive (property), the parcel at the center of the dispute, in Waterford. The property is a thirty-seven acre parcel of land in an industrial park at the eastern end of a cul-de-sac street. Adjacent to the property, Kobyluck Brothers also owns 24 Industrial Drive, which contains a concrete manufacturing plant operated by Kobyluck Construction.

On December 5, 2011, the plaintiffs applied to the commission for a special permit and site plan approval seeking permission to construct a "building materials manufacturing facility" on the property. According to the plaintiffs, because the property was located in a general industrial district (I-G district), the proposed development was consistent with the town's land use plan and permitted under § 11.2 of the regulations. Relevant to this appeal, § 11.2.11 of the regulations provided, in relevant part, that the following was a permitted use in an I-G district: "Manufacture of asphalt, cement, cinder block, or other building materials . . . ."

The plaintiffs' principal purpose in applying for a special permit and site plan approval was to build a permanent facility to "manufactur[e] . . . earth products used in the construction industry," i.e., "crushed stone, septic gravel, and aggregate . . . ."[3] To accomplish this, the plaintiffs first needed to excavate and remove from the property approximately 350,000 cubic yards of earth products, which included bedrock. The extracted earth products would be crushed and sorted by industrial machinery; afterward, the finished product would be removed from the property. Once the permanent facility was completed, the plaintiffs would no longer extract materials from the property. Rather, the plaintiffs intended to bring raw materials from off-site to their permanent facility and then transport the finished products off-site. In short, the plaintiffs sought to crush extracted bedrock into a product suitable for use in the construction industry.

Public hearings on this application began on April 9, 2012, and continued to various dates thereafter, con-

cluding on June 25, 2012. Subsequently, the commission unanimously denied the plaintiffs' application on July 9, 2012. Relevant to this appeal, the commission found that the plaintiffs' proposed use was not permitted under § 11.2.11 of the regulations. Specifically, it determined that the plaintiffs' proposed use was "processing" and not "manufacturing." The plaintiffs filed a timely appeal with the Superior Court on July 26, 2012.

On April 10, 2014, the court held a hearing on the threshold issue of whether the plaintiffs' applications were for a permitted use in an I-G district. See footnote 1 of this opinion. On July 31, 2014, the court issued a memorandum of decision. After determining that the "rock crushing facility proposed by the plaintiff [did] not constitute 'manufacturing,' " the court concluded that the plaintiffs' proposed use of the property was not a specially permitted use under the regulations when the plaintiffs filed their application.

Preliminarily, the court described the plaintiffs' proposed use: "[T]here can be no question that what the plaintiffs intend to do on th[e] property is crush rocks— that is, either from materials on-site or materials brought from off-site. The plaintiffs intend to process rocks and crush them into smaller rocks, which would be used for various construction projects." The court then set forth the parties' arguments: "The plaintiffs argue that a rock crushing facility would fall within the scope of § 11.2.11 of the zoning regulations because that proposed use constitutes the manufacture of building materials. The [commission] counters that rock crushing does not qualify as 'manufacturing,' but rather is classified as 'processing' rock through a rock crushing facility, and such processing of rock is not a permitted use under § 11.2.11." Accordingly, the court proceeded to construe the term "manufacturing" as used in § 11.2.11 of the regulations.

The court found § 11.2.11 of the regulations ambiguous for two reasons. First, neither "manufacture" nor "building materials" was defined in the regulations. Second, the court determined that the plaintiffs' proposed use of "crush[ing] large rocks into smaller rocks" that "would subsequently be sold for use in construction projects" was distinct from the manufacturing of asphalt, cement, or cinder blocks, which was expressly enumerated in § 11.2.11, because the latter products required "various ingredients [to be] mixed to form a new product . . . ." Having found that the regulation was ambiguous, the court appropriately sought interpretative guidance. See, e.g., *Anatra* v. *Zoning Board of Appeals*, 307 Conn. 728, 739, 59 A.3d 772 (2013).

Specifically, the court looked at "(1) internal clues in the regulations themselves, (2) dictionary definitions of the word 'manufacture,' and (3) the manner in which other cases have construed 'manufacture' in its common usage, both generally and specifically to rock

crushing." Its interpretative analysis led the court to conclude that the plaintiffs' "excavation and crushing of rock to create aggregate [did] not constitute 'manufacturing' of other building materials under the regulations, and is more properly classified solely as 'processing' of the materials." Accordingly, the court found that the plaintiffs' proposed use of the property was not a specially permitted use. On October 16, 2014, the court issued an order expressly affirming the commission's denial of the plaintiffs' special permit and site plan approval application. This appeal followed.

On appeal, the plaintiffs contend that the court's analysis was flawed and led it to misconstrue the term "manufacturing." The plaintiffs argue that neither the dictionary definition nor the relevant state case law supports the court's construction of the term "manufacturing," and consequently, the court erroneously interpreted the regulations. The plaintiffs assert that the court should have considered the definition of "manufacturing," as provided in General Statutes § 12-81 (72) (A) (iii), a tax exemption statute, and compared it with the definition of "processing," also provided in the same statute. General Statutes § 12-81 (72) (A) (v). The commission counters that not only was the court's interpretation of the regulations faithful to the dictates of General Statutes §§ 1-1 (a) and 1-2z, but also that the plaintiffs' reliance on a tax exemption statute is unavailing because § 12-81 (72) has no bearing on the regulations and has not superseded local regulations in that the statute does not prescribe to municipalities what activities are to be classified as manufacturing. Moreover, the commission argues that the court's use of extratextual sources was both reasonable and accurate. This is a close question, well presented in a thoughtful memorandum of decision by the trial court, but we conclude that the judgment must be reversed.

We first set forth the standard of review and relevant legal principles. "Our review of the court's interpretation of the zoning regulations is plenary. . . . Thus, we must determine whether the conclusions reached by the court are legally and logically correct and supported by the facts in the record. . . . Generally, it is the function of a zoning [commission] . . . to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The trial court had to decide whether the [commission] correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . .

"A local board or commission is in the most advantageous position to interpret its own regulations and apply them to the situations before it. . . . Although the position of the municipal land use agency is entitled to some deference . . . the interpretation of provisions in the

ordinance is nevertheless a question of law for the court. . . . The court is not bound by the legal interpretation of the ordinance by the [commission]." (Citations omitted; internal quotation marks omitted.) *Balf Co.* v. *Planning & Zoning Commission*, 79 Conn. App. 626, 635–36, 830 A.2d 836, cert. denied, 266 Conn. 927, 835 A.2d 474 (2003).

"[Z]oning regulations are local legislative enactments . . . and, therefore, their interpretation is governed by the same principles that apply to the construction of statutes. . . . Moreover, regulations must be interpreted in accordance with the principle that a reasonable and rational result was intended . . . ." (Internal quotation marks omitted.) *Trumbull Falls, LLC* v. *Planning & Zoning Commission*, 97 Conn. App. 17, 21–22, 902 A.2d 706, cert. denied, 280 Conn. 923, 908 A.2d 545 (2006). Therefore, we employ our well established tools of statutory construction.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning . . . § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . In addition . . . § 1-1 (a) provides in relevant part that words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." (Citation omitted; internal quotation marks omitted.) *Fillion* v. *Hannon*, 106 Conn. App. 745, 751, 943 A.2d 528 (2008). When definitions are not provided in the zoning regulations, courts "look to the common understanding expressed in the law and in dictionaries." (Internal quotation marks omitted.) Id. Moreover, no one aspect of our rules of statutory construction is dispositive. See generally *In re William D.*, 284 Conn. 305, 312, 933 A.2d 1147 (2007) ("there is no one canon of statutory construction that trumps all others").

We bear in mind that "[a] court must interpret a statute as written . . . and it is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation. . . . The language of the ordinance is construed so that no clause or provision is considered superfluous, void or insignificant. . . . Common sense must be used in construing the regulation, and we assume that a rational and reasonable result was intended by the local legisla-

tive body." (Internal quotation marks omitted.) *Balf Co.* v. *Planning & Zoning Commission*, supra, 79 Conn. App. 636. "The words employed by the local legislative body are to be interpreted in accordance with their natural and usual meaning . . . ." (Internal quotation marks omitted.) *Farrior* v. *Zoning Board of Appeals*, 70 Conn. App. 86, 90, 796 A.2d 1262 (2002).

Because zoning regulations are "in derogation of common law property rights . . . the regulation[s] cannot be construed beyond the fair import of its language to include or exclude by implication that which is not clearly within its express terms." (Internal quotation marks omitted.) *Fillion* v. *Hannon*, supra, 106 Conn. App. 752; see also *Viera* v. *Cohen*, 283 Conn. 412, 426, 927 A.2d 843 (2007) ("[w]hen a statute is in derogation of common law . . . it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction" [internal quotation marks omitted]). Critical to our resolution of this case, "doubtful language will be construed against rather than in favor of a [restriction] . . . ." (Internal quotation marks omitted.) *Fillion* v. *Hannon*, supra, 752. With these legal principles in mind, we turn to the merits of the case.

We first examine the regulations.[4] As a threshold matter, we agree with the court that § 11.2.11 of the regulations is ambiguous. The regulations did not define "manufacture," "processing," and "building materials." Absent these definitions and because both parties present a reasonable interpretation of § 11.2.11, a reviewing court could not determine conclusively from the language alone whether the plaintiffs' proposed use, i.e., crushing excavated bedrock to produce construction aggregate, was permissible in an I-G district. See *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 197–98, 3 A.3d 56 (2010) ("[a] statute is ambiguous if, when read in context, it is susceptible to more than one reasonable interpretation" [internal quotation marks omitted]).

The court aptly noted that the regulations often used "manufacture" and "processing" in the same sentence, separated by the conjunction "or."[5] We agree with the court that this suggests that the drafters of the regulations intended to attach different meanings to the terms "manufacture" and "processing." See *Celentano* v. *Oaks Condominium Assn.*, 265 Conn. 579, 609, 830 A.2d 164 (2003) ("fundamental tenet of statutory construction that [t]he use of . . . different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings" [internal quotation marks omitted]). Moreover, we acknowledge that it is significant that "processing" was omitted from § 11.2.11. See *Viera* v. *Cohen*, supra, 283 Conn. 431 ("[t]ypically, the omission of a word

otherwise used in the statutes suggests that the legislature intended a different meaning for the alternate term"). We depart, however, from the court's interpretation of the regulations in its analysis of §§ 10.2.4.1 and 25.1.4 (a) of the regulations.

Section 10 of the regulations provided the guidelines and the permitted uses in a "civic triangle district." Section 10.2 listed the permitted uses in the district, subject to the approval of a special permit, and storage warehouses were listed as a permitted use. Section 10.2.4.1 stated in its entirety: "The assembly of products held in storage warehouses shall be allowed as an accessory use only (not to exceed 25 [percent] of the space occupied by any individual tenant or owner), provided that the assembly does not involve a manufacturing process of any kind and complies with [s]ection 1.4 of these [r]egulations." Because § 1.4 defined "assembly" as "[t]he combining of component parts having form and substance by physically mating or joining the component parts," the court reasoned that "assembly" was not necessarily "manufacturing"; thus, the court concluded that § 10.2.4.1 "reveal[ed] that the drafters intended that 'manufacture' not have an exceedingly expansive definition in the regulations, even if the word could be more expansive in some instances of common usage." We do not agree with the court's conclusion.

Indeed, the meaning of "assembly" does not share the same meaning as "manufacturing process." It does not necessarily follow that the term "assembly," as defined by § 1.4 and used in § 10.2.4.1, limited the definition of "manufacture," which was not included in § 10.2.4.1. The term "manufacturing," which was part of § 10.2.4.1, is a transitive verb and, in this context, can be defined as "to make or produce by hand or machinery, [*especially*] *on a large scale*." (Emphasis added.) Random House Webster's Unabridged Dictionary (2d Ed. 2001). A simpler reading of § 10.2.4.1 is that an owner or tenant of a storage warehouse, which has been granted a special permit, may assemble the component parts of products, which are held in the storage warehouse as an accessory use of the warehouse, so long as the space occupied by the products does not exceed 25 percent of the warehouse and assembling the products was not done on a large scale.

We also do not agree with the court's interpretation of § 25.1.4 (a) of the regulations, which stated in relevant part: "No screening, sifting, washing, crushing or other processing of extracted earth materials shall be conducted on the premises unless located within an industrial, commercial or [rural residential] [d]istrict." Because "processing" was used in conjunction with "crushing," and this was the only section in the regulations that expressly mentioned rock crushing, the court was persuaded to conclude that "the drafters of the regulations intended that rock crushing would not qual-

ify as the 'manufacture of building materials' under § 11.2.11." We do not interpret § 25.1.4 (a) so broadly. To be sure, the language of § 25.1.4 (a) indicated that the four enumerated activities, including rock crushing, were a form of "processing." Nonetheless, this does not imply that all forms of rock crushing, especially when it is an integral part of a series of actions, such as in manufacturing construction aggregate, were excluded. We are mindful that "[z]oning regulations . . . cannot be construed to include or exclude by implication what is not clearly within their express terms." (Internal quotation marks omitted.) *Poirier* v. *Zoning Board of Appeals*, 75 Conn. App. 289, 304, 815 A.2d 716, cert. denied, 263 Conn. 912, 821 A.2d 766 (2003).

Although it is clear that the regulations did not treat "manufacture" and "processing" synonymously, and the regulations classified rock crushing as a form of processing, it is less clear that the regulations were intended to exclude this activity in the "manufacture . . . of other building materials," which could include rock crushing. Because of the inherent ambiguity created by the regulations, we turn to extratextual sources.[6]

First, "[i]f a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Heim* v. *Zoning Board of Appeals*, 289 Conn. 709, 717, 960 A.2d 1018 (2008). When using a dictionary to understand a word, this court has explained that "any word in the English language—except for words of specialized contexts, such as mathematics or science—will ordinarily have multiple meanings, depending on the context in which it has been used. . . . That is why we have dictionaries: not to determine *the* meaning of a given word, or even *the preferred* meaning of a given word, but simply to give us a lexicon of the various meanings that the word has carried depending on the various contexts of its use." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Community Renewal Team, Inc.* v. *United States Liability Ins. Co.*, 128 Conn. App. 174, 180–81, 17 A.3d 88, cert. denied, 301 Conn. 918, 21 A.3d 463 (2011); see also *Northrop* v. *Allstate Ins. Co.*, 247 Conn. 242, 250, 720 A.2d 879 (1998) ("Although we have on occasion looked to dictionaries in order to give meaning to words used in a legal context . . . that does not mean . . . that a dictionary gives *the* definition of any word. A dictionary is nothing more than a compendium of the various meanings and senses in which words have been and are used in our language. A dictionary does not define the words listed in it in the sense of stating what the words mean universally. Rather, it sets out the range of meanings that may apply to those words as they are used in the English language, depending on the varying contexts of those uses." [Emphasis in original.]).

Section 11.2.11 of the regulations used "manufacture" as a noun; accordingly, we consider the definition of the word as a noun. The eleventh edition of Merriam-Webster's Collegiate Dictionary published in 2003 defines "manufacture" as "something made from raw materials[7] by hand or by machinery . . . the act or process of producing something." (Footnote added.) By contrast, "process" means "a series of actions or operations conducting to an end; *esp*[8] . . . a continuous operation or treatment esp[ecially] in manufacture . . . ." (Footnote added.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003). Random House Webster's Unabridged Dictionary provides similar definitions. "Manufacture," is defined as "the making of goods or wares by manual labor or by machinery, [especially] on a large scale"; Random House Webster's Unabridged Dictionary (2d Ed. 2001); and "process" is defined as "a systematic series of actions directed to some end . . . ." Id.

The only distinction of consequence between the two definitions of "manufacture" is that Merriam-Webster's Collegiate Dictionary includes "raw materials." The essence of the definitions, however, centers on making something either by hand or by machinery, and, in the case of Merriam-Webster's Collegiate Dictionary's definition, that "something" is made from raw materials. As applied to the facts of this case, one could interpret "manufacture" to mean that the construction aggregate (the "something" made from bedrock, the raw material) is made by machinery.

Similarly, the definitions of "process" are comparable in that both dictionaries envision a "series of actions" that occur to something for some particular end. One key difference is that Merriam-Webster's Collegiate Dictionary points out that the most common meaning of "process," "a continuous operation or treatment [especially] in manufacture," is subsumed by the more general meaning. This suggests that "process," as most commonly meant, can be part of the "manufacture." As applied to this case, excavating bedrock, crushing it into smaller pieces, and screening the smaller pieces is "a continuous operation . . . in [the] manufacture" of construction aggregate.

From legal treatises, we glean a better understanding of how the term is used in zoning law. From one treatise, "manufacturing" is defined as "involv[ing] the application of labor and skill to materials that exist in the natural state, and giv[ing] to them a new quality or characteristic and adapt[ing] them to new uses," or as "the production of articles for use from raw or unprepared materials by giving these materials new forms, qualities, properties or combinations whether by hand labor or machine." (Internal quotation marks omitted.) 5 A. Rathkopf & D. Rathkopf, Law of Zoning and Planning (4th Ed. 2011) § 86.2, p. 86-66. From another, "man-

ufacturing" is defined as "[e]stablishments engaged in the mechanical or chemical transformation of materials or substances into new products, including the assembling of component parts, the manufacturing of products and the blending of materials such as lubricating oils, plastics, resins or liquors." 4 P. Salkin, American Law of Zoning (5th Ed. 2009) § 41:16, p. 41-81 (citing § 195-7 of the Derby Zoning Regulations, as amended to 2006). Applying those definitions to the facts of this case, it appears that after the excavated bedrock (a material in its natural state) is crushed by industrial rock crushing machinery, the resulting product (construction aggregate) is given "a new quality or characteristic and [is] adapt[ed] . . . to new uses" in the construction industry.

The dictionary definitions of "manufacture" and "process," coupled with the manner in which "manufacturing" is defined by two legal treatises discussing zoning law, lead us to conclude that, as presented by the facts of this case, construction aggregate is manufactured through a series of actions, namely, excavating bedrock (the raw material), crushing the large, unusable rocks with industrial rock crushing machinery, and screening and sorting the smaller pieces of rock. In other words, through a continuous operation, once the excavated bedrock is crushed, screened, and sorted, the resulting construction aggregate has been given a "new quality or characteristic and adapt[ed] . . . to new uses."

As a final step in our analysis, we turn to relevant case law. See *Fillion* v. *Hannon*, supra, 106 Conn. App. 751 (when definition not provided by statute, courts "look to the common understanding expressed in the law" [internal quotation marks omitted]). Preliminarily, we highlight a critical distinction between two statutory construction principles. As mentioned previously, "doubtful [zoning regulation] language will be construed *against rather than in favor of a* [*restriction*] . . . ." (Emphasis added; internal quotation marks omitted.) Id., 752. This principle is significant here because most of the cases that we have found that analyze the term "manufacture" are not in zoning cases. Indeed, the three cases that the court relied on were not in a zoning context; *American Sumatra Tobacco Corp.* v. *Tone*, 127 Conn. 132, 133–34, 15 A.2d 80 (1940), was an unemployment compensation case; both *Connecticut Water Co.* v. *Barbato*, 206 Conn. 337, 338, 537 A.2d 490 (1988), and *Solite Corp.* v. *King George County*, 220 Va. 661, 662, 261 S.E.2d 535 (1980), were tax assessment appeals. In tax assessment appeals, "[i]t is a settled rule of law that statutes which exempt from taxation are to be strictly construed *against the party claiming* an exemption. . . . [N]o claimant is entitled to an exemption unless [the claimant] satisfies all the statutory requirements." (Citations omitted; emphasis added; internal quotation marks omitted.) *Connecticut Water Co.* v. *Barbato*, supra, 343; see also *Solite Corp.*

v. *King George County*, supra, 662–63 ("Statutes grant-
ing tax exemptions are construed strictly against the
taxpayer. When a tax statute is susceptible of two con-
structions, one granting an exemption and the other
not granting it, courts adopt the construction which
denies the exemption." [Internal quotation marks omit-
ted.]). As is clear, in a zoning case, construing ambigu-
ous zoning regulations favors the landowner and not
the government, but in a tax assessment appeal, the
opposite is true; in construing ambiguous tax exemp-
tion statutory language, a reviewing court will favor the
government and not the taxpayer. This difference, in
our judgment, militates in favor of construing the ambig-
uous language in § 11.2.11 against the restriction. Thus,
analogizing cases interpreting "manufacturing" in a tax
context to this zoning case may have limited value.

Nevertheless, we find *Connecticut Water Co.* useful
for the limited proposition that, in the absence of con-
trolling definitions provided by the zoning regulations
of the town of Waterford, we may consult definitions
from both Connecticut statutes and other state regula-
tions for *guidance* on how to interpret "manufacture."
The court in *Connecticut Water Co.* determined that
the "transformation of raw water into finished, potable
water at the [plaintiff's] treatment plant [was] not a
process that constitutes 'manufacturing' within the
meaning of General Statutes § 12-412 (34) [a tax exemp-
tion statute]." *Connecticut Water Co.* v. *Barbato*, supra,
206 Conn. 344. In reaching this result, the court relied,
in part, on the Department of Revenue Services' defini-
tion of "manufacturing." Id., 341. Thus, like our
Supreme Court, we examine a regulatory definition.

The regulatory definition that our Supreme Court
relied upon in *Connecticut Water Co.*, § 12-426-11b of
the Regulations of Connecticut State Agencies, was
repealed effective April 23, 1991. Now, § 12-412 (34)-1 of
the Regulations of Connecticut State Agencies defines
"manufacturing" as follows: "As used in this regulation,
the term 'manufacturing' means an operation or an inte-
grated series of operations that substantially transform,
by physical, chemical or other means, the form, compo-
sition or character of raw or finished materials into a
product possessing a new name, nature and use which
is intended for sale, whether by the manufacturer or
by another on whose behalf the manufacturer has
undertaken the manufacture. The transformation can-
not be a mere natural process, whether or not expedited
by the use of machinery. . . ." To aid the Commissioner
of Revenue Services in distinguishing whether "a pro-
cess constitutes manufacturing," § 12-412 (34)-1 pro-
vides guiding principles. Relevant to this appeal, "[i]f
the process involves only physical change to property,
the greater the degree of physical change, the more
likely the process is to be manufacturing. For example,
the process of cleaning, cutting and flash-freezing vege-
tables does not involve a sufficient degree of physical

change to be considered manufacturing, while *the process of quarrying and cutting brownstone into blocks of a size usable by building contractors does involve a sufficient degree of physical change to be manufacturing.*" (Emphasis added.) Id., § 12-412 (34)-1 (c) (4).

Furthermore, at the time our Supreme Court decided *Connecticut Water Co.*, there was no statutory definition of "manufacturing." See *Connecticut Water Co.* v. *Barbato*, supra, 206 Conn. 341. Now, § 12-81 defines the term as follows: "The following-described property shall be exempt from taxation . . . (72) . . . (A) . . . (iii) 'Manufacturing' means the activity of converting or conditioning tangible personal property by changing the form, composition, quality or character of the property for ultimate sale at retail or use in the manufacturing of a product to be ultimately sold at retail. Changing the quality of property shall include any substantial overhaul of the property that results in a significantly greater service life than such property would have had in the absence of such overhaul or with significantly greater functionality within the original service life of the property, beyond merely restoring the original functionality for the balance of the original service life." The same statute defines "processing" to mean the "physical application of the materials and labor in a manufacturing process necessary to modify or change the characteristics of tangible personal property." General Statutes § 12-81 (72) (A) (v).

We temper our reliance on the statutory and regulatory definitions of "manufacturing" with the understanding that those definitions were drafted within the confines of tax exemptions. Thus, neither statutory nor regulatory definitions are dispositive. We note, however, that the statutory and regulatory definitions are substantially similar to definitions found in legal treatises on zoning law. Therefore, we find the statutory and regulatory definitions useful in determining whether "manufacture," as used in the zoning regulations of this case, includes the plaintiffs' proposed use.

Section 12-412 (34)-1 (c) (4) of the Regulations of Connecticut State Agencies is particularly enlightening because it so nearly describes the plaintiffs' proposed use. Despite our rule of law that "statutes which exempt from taxation are to be strictly construed against the party claiming an exemption"; (internal quotation marks omitted) *Connecticut Water Co.* v. *Barbato*, supra, 206 Conn. 343; if this were an appeal in which the plaintiffs were seeking a tax exemption, we would be hard-pressed to construe General Statutes § 12-81 (72) or § 12-412 (34)-1 (c) (4) of the Regulations of Connecticut State Agencies against the plaintiffs. Thus, in light of the principle of statutory construction that "doubtful [zoning regulation] language will be construed against rather than in favor of a [restriction]"; (internal quotation marks omitted) *Fillion* v. *Hannon*,

supra, 106 Conn. App. 752; and that the statutory and regulation definitions closely resemble the definitions in legal treatises that focus on zoning law, we are persuaded that excavating bedrock, crushing it with industrial rock crushing machinery, and screening and sorting the resulting product is "an operation or an integrated series of operations that substantially transform, by physical . . . means, the form, composition or character of raw . . . materials into a product possessing a new name, nature and use . . . ." Regs., Conn. State Agencies § 12-412 (34)-1. In short, the plaintiffs are manufacturing construction aggregate from the excavated bedrock.

We acknowledge that *American Sumatra Tobacco Corp.*, supra, 127 Conn. 134, a case relied on by the trial court, would seem to point to a different result. There, our Supreme Court concluded that cured tobacco leaves, after having undergone a "complicated, intricate and unique process" in preparation for sale, were nonetheless left in an unmanufactured state. Id., 139. In reaching this result, the court noted that in drying the tobacco leaves, "[n]othing was done to this tobacco from the time it left the field until it was packed except to permit it to cure itself. The leaf which was ultimately packed was the same leaf in size and shape as grew in the field. Nothing had been added and nothing taken away. It is still a leaf of tobacco." Id., 138. Accordingly, the court, acknowledging the remedial nature of the unemployment compensation statute and "the fact that exceptions to the general policy of the law are to be strictly construed"; id., 141; concluded that the plaintiff's employees, when curing the tobacco leaves, were engaged "in ordinary farming operations" and not in "manufacturing or commercial operations" for the purposes of an unemployment compensation statute. Id., 137.

The court in the present matter analogized the plaintiffs' proposed use of crushing rocks to curing tobacco leaves, i.e., if tobacco is tobacco, then rock is rock, hence no manufacturing. We disagree with this analogy. Unlike *American Sumatra Tobacco Corp.*, in which the leaf that ultimately was picked was the "same leaf in size and shape as [grown] in the field"; id., 138; in this case, the excavated bedrock (raw material) was changed in size and shape to produce construction aggregate, which has a new form, quality, and property that is different from the bedrock that was used to produce it. Moreover, because this case, unlike *American Sumatra Tobacco Corp.*, is a zoning case, we iterate that "doubtful [zoning regulation] language will be construed against rather than in favor of a [restriction] . . . ." (Internal quotation marks omitted.) *Fillion* v. *Hannon*, supra, 106 Conn. App. 752; see also *Coots* v. *J. A. Tobin Construction Co.*, 634 S.W.2d 249, 251–52 (Mo. App. 1982) (explaining that zoning ordinances "are to be strictly construed in favor of the property owner

against the zoning authority . . . [and that] courts are to 'give weight to the interpretation that, while still within the confines of the term, is least restrictive upon the rights of the property owner to use his land as he wishes,' " and concluding that "rock quarrying and crushing, by application of reasonable and settled definitions of the term 'manufacturing' are industrial uses which the zoning order authorizes in [an industrial district]" [citations omitted]). These distinctions, as well as our analysis of the definition of "manufacture," persuade us to interpret the term, as presented by the facts of this case, to include the plaintiffs' proposed use.[9]

"[E]very owner of property located in a town which has adopted zoning is entitled to be able to ascertain, with reasonable certainty, what uses he may legally make of any portion of his property." *Farrior* v. *Zoning Board of Appeals*, supra, 70 Conn. App. 95. In this case, the regulations created ambiguity by not defining "manufacture," "processing," or "building materials." Because we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned* v. *Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972). Thus, absent expressly defined terms in the zoning regulations, on the basis of our holistic evaluation of the text of the regulations, the definitions from both dictionaries and legal treatises that focus on the law of zoning, and the relevant case law, we conclude that the natural and usual meaning of the term "manufacture," as commonly understood, must be construed to include the plaintiffs' proposed use, i.e., manufacturing construction aggregate, that is, through a series of operations, the excavated bedrock (raw material) is crushed and sorted using industrial machinery and substantially transformed into a product possessing a new name (construction aggregate), nature, and use in the construction industry.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

[1] The plaintiffs' appeal before this court was one of four consolidated zoning appeals that it brought to the Superior Court following the denial of two other applications in connection with the plaintiffs' special permit and site plan application, as well as an appeal arising from the commission's amendments to the Waterford Zoning Regulations that were made effective shortly after the plaintiffs' applications were filed. The parties agreed that the threshold issue in all four appeals to the trial court was "whether . . . the plaintiffs' applications were for a permitted use in an [i]ndustrial I-G [district] at the time such applications were filed." Accordingly, the parties agreed to bifurcate the various issues on appeal to have the court first decide the threshold issue. The other three zoning appeals remain pending in the Superior Court.

[2] The plaintiffs also claim that the court's restrictive interpretation deprived them of due process of law and significant property rights. Because we conclude that the court incorrectly construed the term "manufacture," we need not address this claim.

[3] Neither Connecticut statutes nor case law defines "aggregate." Florida, however, defines "construction aggregate materials" as "crushed stone, limestone, dolomite, limerock, shell rock, cemented coquina, sand for use as a component of mortars, concrete, bituminous mixtures, or underdrain filters,

and other mined resources providing the basic material for concrete, asphalt, and road base." Fla. Stat. § 337.0261 (Rev. to 2016); see, e.g., *France Stone Co.* v. *Monroe*, 802 F. Supp. 90, 92 n.1 (E.D. Mich. 1992) ("[d]olomite stone is a natural resource which, when quarried, crushed and processed, is highly useful as a construction aggregate, including usefulness as an aggregate in highway construction"); *Gifford-Hill & Co.* v. *Federal Trade Commission*, 389 F. Supp. 167, 170 n.6 (D.D.C. 1974) ("'[c]onstruction aggregates' are sand, and gravel or crushed stone"), aff'd, 523 F.2d 730 (D.C. Cir. 1975).

[4] We note that on December 9, 2011, after the plaintiffs filed their application in this matter, the commission amended its regulations effective December 22, 2011. Specifically, it revised § 11.2.11 to read: "Manufacture of asphalt, concrete, or products manufactured from concrete." The relevant reasons the commission provided for this amendment were to "[c]larif[y] [the commission's] understanding and intent of the regulation regarding other building materials being derived from concrete products and was not intended to be broadly interpreted to include any material used in any type of construction," and to make "[t]he changes . . . more specific and [provide] land owners sufficient information to understand what is allowed." Relevant to this matter, the parties agreed that the operative regulations that were to be interpreted by the trial court were those that existed prior to the 2011 amendments. Accordingly, we also interpret those regulations.

[5] For example, the court highlighted §§ 11.1.5 and 11.2.22 of the regulations where "manufacture" was used in conjunction with either "processing" or "processed." Section 11.1.5 of the regulations stated in relevant part: "The manufacture, processing, or packaging of food, candy, pharmaceuticals . . . ." Section 11.2.22 of the regulations stated in relevant part: "The retail sale of industrial services, manufactured and/or processed items shall be permitted . . . ."

[6] The fact that the commission "clarif[ied]" § 11.2.11 shortly after the plaintiffs filed their special permit and site plan application; see footnote 4 of this opinion; supports our conclusion that the § 11.2.11 was ambiguous and must be construed against the commission. See *Fillion* v. *Hannon*, supra, 106 Conn. App. 752.

[7] The term "raw material" is defined as "crude or processed material that can be converted by manufacture, processing, or combination into a new and useful product . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003).

[8] "The sense divider *esp* (for *especially*) is used to introduce the most common meaning subsumed in the more general preceding definition . . . ." (Emphasis in original.) Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 20a.

[9] The court in this case also relied on a Virginia Supreme Court case holding that "the process of crushing and screening of rock into various sizes does not constitute manufacturing." *Solite Corp.* v. *King George County*, supra, 220 Va. 664. We note that *Solite Corp.* was decided in a tax assessment appeal in which the Virginia Supreme Court "construed [the tax exemption statute] strictly against the taxpayer." (Internal quotation marks omitted.) Id., 662. Thus, *Solite Corp.* has limited applicability to this case.

We acknowledge that a number of sibling jurisdictions have concluded, in a tax context, that crushing rock is not manufacturing. See id., 664, and cases cited therein; see also *Tilcon-Warren Quarries, Inc.* v. *Commissioner of Revenue*, 392 Mass. 670, 672–73, 467 N.E.2d 472 (1984) (concluding, in tax exemption case, that "extracting pieces of rock from the ground and crushing them into usable sizes does not compel the conclusion that the process fits within the natural and ordinary meaning of 'manufacturing' "); *River Products Co.* v. *Board of Review of Washington County*, 332 N.W.2d 116, 119 (Iowa App. 1982) (holding that "the quarrying of rock does not constitute manufacturing" in tax exemption case); but see *Dolese Bros. Co.* v. *State ex rel. Oklahoma Tax Commission*, 64 P.3d 1093, 1102 (Okla. 2003) (iterating, in tax exemption case, that in Oklahoma "[t]he manufacture of crushed stone has been recognized as manufacturing since . . . *Tulsa Machinery* [*Co.* v. *Oklahoma Tax Commission*, 208 Okla. 138, 253 P.2d 1067 (1953)]" [emphasis omitted]). We note, however, that *Schumacher Stone Co.* v. *Tax Commission*, 134 Ohio St. 529, 18 N.E.2d 405 (1938), which was cited in *Solite Corp.*, was overruled.

In *Stoneco, Inc.* v. *Limbach*, 53 Ohio St. 3d 170, 173, 560 N.E.2d 578 (1990) (per curiam), the Ohio Supreme Court overruled *Schumacher Stone Co.* v. *Tax Commission*, supra, 134 Ohio St. 538, which had held that "crushing and screening limestone into various merchantable sizes" was not manufacturing. In reaching its conclusion, the court in *Stoneco, Inc.*, explained that

*Schumacher Stone Co*. had "failed to recognize the new form given to the limestone by the crushing equipment and the more valuable commodity consequently created." *Stoneco, Inc.* v. *Limbach*, supra, 173. Thus, the Ohio Supreme Court concluded that the plaintiff in *Stoneco, Inc.*, when taking "raw material, limestone, and convert[ing] it into a new form with new qualities and into a more valuable commodity, limestone aggregate . . . [the plaintiff was] convert[ing] a raw material that [could not] be used for construction and transform[ing] it into a product that can. Thus, [the plaintiff was using] the crushing, sorting, and mixing equipment in manufacturing." Id. The decision in *Stoneco, Inc.*, however, was decided in a tax context.

---